Frederick L. JONES et al., Appellants,

v.

TRANS WORLD AIRLINES, INC., et al.,
Appellees.

No. 388, Docket 73-2029.

United States Court of Appeals,
Second Circuit.

Argued Jan. 24, 1974.

Decided April 9, 1974.

Rains, Pogrebin & Scher, Mineola, N. Y., on the brief; Bertrand B. Pogrebin, Frederick D. Braid, Mineola, N. Y., of counsel, for appellants.

Michael D. Gordon, Kansas City, Mo. (Jolley, Walsh, Gordon & Staab, Kansas City, Mo., on the brief), for appellee District 142.

Irving Gutin, Lotwin Goldman Gutin Rosen & Greene, New York City, for ap-pellees Intern. Assn. of Machinists and Local Lodge 1056.

Harold L. Warner, Jr., New York City (Chadbourne, Parke, Whiteside & Wolff, New York City, on the brief; Bernard J. Rosenthal, New York City, of counsel), for appellee Trans World Airlines, Inc.

Before MOORE, HAYS and OAKES, Circuit Judges.

HAYS, Circuit Judge:

The appellants are employees of Trans World Airlines, Inc. [TWA], currently working in the guard job classification at TWA's passenger teriminal at John F. Kennedy Airport. TWA is a "common carrier by air engaged in interstate or foreign commerce" as those terms are used in section 201 of the Railway Labor Act, 45 U.S.C. § 181 (1970), and as such is subject to the provisions of the Act.

Appellants brought this action against their employer, their collective bargaining agent, the International Association of Machinists and Aerospace Workers, and District 142 and Local Lodge 1056 of that International. The gravamen of their complaint is that the International and its subdivisions violated their duty to represent them fairly during the negotiations leading to the signing of a contract between the International and TWA in January of 1970, a period during which the appellants were not members of the union. They complain that under the contract, union members were given job seniority over non-members. They pray for a permanent injunction of discrimination, an order directing TWA to give them job seniority from their date of hire, and money damages for salary differentials and salary and benefits lost during periods in which four of the appellants were laid off.

The District Court for the Southern District of New York held for the appellees. It found that the union did not negotiate the adjustment in seniority out of hostility toward the appellants, and that the appellants were employees at will since they were not in the collective

bargaining unit represented by the union. Accordingly, it held that the union had no duty to protect the appellants' interests.

We reverse and remand for a hearing on the issue of damages.

### Facts

In 1946 pursuant to an order of the National Mediation Board, TWA recognized the International as the exclusive bargaining representative for three collective bargaining units of TWA employees. One of these units, at least until 1970, consisted of "guards," employees responsible, among other things, for directing and controlling traffic, mainly in the hangar areas.[1]

District 142 is the subordinate body of the International with nation-wide responsibility for bargaining with TWA and Ozark Airlines. Local 1056 is the subordinate body of District 142 representing TWA employees in the New York City area, including those at the John F. Kennedy terminal. Since the International and its subdivisions each played a role in negotiating or implementing the 1970 contract, we will refer to them jointly as the "IAM."

At various times during the period from May 1964 to April 1969 the appellant employees were hired by TWA to work at the Kennedy terminal as "passenger relations agent-traffic coordinators." Their primary duty was to control pedestrian and vehicular traffic in and around the terminal, but at times they answered passenger inquiries. The appellants were not members of the IAM when they were hired. Prior to 1970, they were not asked to join the union, and they were not informed that they must join the union as a condition of continued employment under the union

security clauses of the TWA–IAM contracts in effect during that period.

The present controversy emerged from the negotiation and implementation of the 1970 collective bargaining contract between the IAM and TWA. The bargaining leading up to the contract began late in 1968, when District 142 served a notice of intended changes under section 6 of the Railway Labor Act. 45 U.S.C. § 156 (1970). After protracted negotiations between District 142 and TWA, on January 28, 1970, the International and TWA entered into a new agreement, which was ratified by a vote of the majority of the members of Local 1056.

One of District 142's demands in its notice of intended changes was that the work of passenger relations agents be included in the IAM jurisdiction. The union's objective was to cure what it perceived to be an erosion of its jurisdiction, to recoup a work function being performed by non-union employees in violation of its jurisdiction as originally defined by the National Mediation Board. During the negotiations, TWA conceded that the passenger relations agent jobs were subsumed in the guard unit. This concession was consistent with the appellants' testimony at trial that they had continuously performed guard work while working in the passenger relations agent job classification.

As a result of TWA's acquiescence, the following language was included as Article II(a) of the 1970 agreement:

"Whenever the Company [TWA] deems it necessary to assign personnel to alleviate congestion of pedestrian or vehicular traffic, TWA–IAM guards will be used."

This clause embodies the IAM proposition that the work of alleviating traffic

---

1. At all times relevant to this appeal prior to January 28, 1970, the guard collective bargaining agreements defined the scope of guard work as follows:

"The Company [TWA] agrees that all work involving the guarding of certain gates, entrances, and other designated posts in and about Company premises, the patrolling of designated areas, the punch-ing of watchman clocks, or other similar assigned duties involving internal security and protection of Company property is recognized as coming within the jurisdiction of the International Association of Machinists, and is covered by this Agreement." Agreement of August 25, 1966, Article II(c).

congestion, wherever it occurred, was guard work.

All agreements covering the guard unit as it existed before 1970 defined seniority as follows:

"Seniority will be by work classification and shall be defined as length of continuous service with the Company as a Guard, including the ability to perform required work in a satisfactory manner."[2]

The January 1970 contract assimilated all guards into the larger unit that had previously covered only mechanics and food service employees. The objective in eliminating the separate guard unit was to prevent a strike by the 60 union guards from forcing the 14,000 other TWA–IAM employees out of work. When the guard unit was assimilated, the guards became subject to a seniority clause in the new contract similar to the clause previously applicable only to the mechanics and food service employees:

"Seniority shall be defined as the length of service for which an employee receives credit, regardless of location, in any of the classifications covered by this agreement with this Company or any of its predecessors. The definition of seniority shall include the ability to perform the required work of the job in a satisfactory manner, and except as hereinafter provided *shall accrue from the date of entering a classification on a regular assignment.*" [Emphasis added.] Article IV(a), 1970 TWA–IAM Collective Bargaining Agreement.

The IAM and TWA also agreed, though not in writing, that the passenger relations agent jobs would be considered vacancies for the purpose of assigning union members to them, even though they were then occupied by non-IAM-member TWA employees.[3] The airline and union in effect agreed that the persons occupying the passenger relations agent positions would be treated as "new hires" in the guard classification for the purpose of computing their seniority under the 1970 contract. The effect of this agreement and of the italicized language in Article IV(a) of the contract was to make IAM-member transferees senior to all of the non-IAM employees

---

2. The term "seniority" in this provision and throughout this opinion refers to "classification seniority," seniority determined by the date on which an employee starts work in a given classification. Under the 1970 and prior contracts, classification seniority determines the order in which employees are laid off. The 1970 contract did not affect the appellants' "company seniority" which dates to the original date of hire regardless of classification, and which is used to determine rights to vacation time, sick leave, and passes.

3. The seniority of the employees who had bid into the new classifications relative to employees already in the classification and new hires was governed by Article X(b)(18) of the 1970 contract:

"The seniority date and the effective date of wage rate of the successful bidder, including employees promoted, shall be the reporting date set forth in the bid notice received by the Local Union Representative at the time the vacancy was announced. Regardless of the reporting date of the successful bidder, no employee will be required to transfer to another point on the system with less than seventeen (17) days written notice. *The seniority date of newly hired employees shall be one (1) calendar day after the reporting date specified in the bid notice or the date they first report to work, whichever is later.* An employee entering a higher classification will start at the minimum pay rate of the higher classification or the pay rate he then held in his former classification, whichever is higher. He will remain at such rate until the date of his next automatic increase, at which time he shall advance to the next higher pay rate of the higher classification." [Emphasis supplied.]

TWA and the IAM interpret this clause to require that the appellants be treated as new hires relative to the successful union bidders. They claim that this interpretation was consistent with the "long-established" practice in the administration of TWA–IAM agreements. Needless to say, the long period of time during which the IAM and TWA have been practicing discrimination based on union membership does not justify that discrimination. The fact that this practice was "long-established" only serves to emphasize its invidious nature.

who had previously held the passenger relations agent jobs, this despite the fact that seniority under prior IAM contracts was fixed by the date of assignment to a given job classification.

In June of 1970, TWA announced that the passenger relations agent jobs were guard vacancies. Twelve of the twenty IAM members who had previously bid into the guard classification were accepted for the jobs by the airline. In July and August, eight of these union members were assigned to guard duty in and around the terminal. The remaining guard vacancies were filled by the appellants who had previously been doing the same work under the "passenger relations agent" label.[4] The appellants testified that the nature of their duties did not change as a result of their change in classification.

In July and August of 1970, the appellant employees signed representation notices after they were informed of the union security clause in Article XXVI of the 1970 contract. They are currently IAM members.

In response to the appellants' inquiries about their seniority, TWA gave them a copy of a letter listing the John F. Kennedy terminal guards in order of classification seniority, showing that all eight IAM transferees had seniority dating from June 22, 1970,[5] and that all of the former passenger relations agents had seniority dating from July 20 or later.[6] A TWA system-wide guard roster circulated in January 1971 showed that the appellants had lower seniority than all IAM members hired before July 20, 1970. Appellants Jones and Dooley protested to TWA representatives, and Local 1056 and District 142 officials, all to no avail. In July, Dooley was demoted from his position of lead passenger relations agent, and two union-member transferees were designated in his place. In December, appellants Donahue and Hunter were laid off, and in April, 1971, appellants Morrisey and Reynolds were laid off. All of the IAM transferees continued to work.[7]

On July 20, 1971, this action was commenced in the District Court for the Southern District of New York. Plaintiffs claimed that the IAM had disregarded its duty to represent them fairly and that the IAM and TWA had discriminated against them on the basis of union membership in negotiating and implementing the 1970 contract. They sought an injunction against continued discrimination, an order directing TWA to credit them with seniority commensurate with their dates of entry into the passenger relations agent classification, and in the cases of employees eligible for the lead passenger relations job and the four laid-off employees, money damages. After a non-jury trial, Judge Duffy denied the requested relief. The employees appealed.

*Remedies under the Railway Labor Act and the 1970 Contract*

The IAM and TWA claimed in the district court that the administrative remedies of section 3 of the Railway La-

---

4. The turn-over rate among passenger relations agents was such that real vacancies occurred with sufficient frequency to make it possible to transfer the eight union employees without laying off any non-union employees.

5. This letter, dated August 25, 1970, showed that the appellants' seniority was inferior to union transferees who did not begin work in the guard unit until after the letter was written.

6. The appellants' dates of seniority are precisely the same as their membership dates in the union. This fact belies the IAM's claim that seniority was based on some factor other than union membership.

7. All of the appellants were subsequently called back to work pursuant to recall rights created by the 1970 agreement. The lay-off periods were as follows:
   Hunter—December 13, 1970 to February 21, 1972
   Donahue—December 13, 1970 to April 10, 1972
   Reynolds—April 11, 1971 to February 23, 1973
   Morrisey—April 8, 1971 to January 17, 1972.

bor Act, 45 U.S.C. § 153 (1970), and the remedies provided by the contract grievance procedure under the 1970 and subsequent collective bargaining agreements are the appellant employees' exclusive remedies. We find that these contentions have no merit.

◼ An employee cannot prosecute a complaint against his collective bargaining agent by resorting to the remedies provided in section 3 of the Railway Labor Act. 45 U.S.C. § 153 (1970). Section 3 First (i) of the Act provides only that disputes between an "employee or group of employees and a carrier or carriers" may be referred to the Adjustment Board. Conley v. Gibson, 355 U.S. 41, 44, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Cunningham v. Erie R. R., 266 F.2d 411, 414–415 (2d Cir. 1959).

In this case, the appellants challenge the validity of the 1970 contract as it is applied to them. They claim that the 1970 contract, though fair on its face, is being enforced and administered in a discriminatory manner.[8]

◼ The appellant employees were not required to exhaust the contract grievance procedure provided in the 1970 collective bargaining agreement. Glover v. St. Louis–S. F. Ry., 393 U.S. 324, 329–330, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969). Were the rule otherwise, the passenger relations agents would be remanded to a remedy administrated and prosecuted by their adversary, the IAM. Pursuit of the contract remedy in this case would have been futile.[9]

*The Guard Collective Bargaining Unit*

The district court held that the non-IAM member passenger relations agents were not members of the guard collective bargaining unit until they joined the union in July of 1970. The district court thus reasoned that any discrimination in assigning seniority was based on unit membership rather than union membership. It found that unit membership is a permissible basis for variation in benefits.

◼ We find the district court's reasoning faulty in two respects. In the first place, the assertion that unit membership is an acceptable basis for benefit differentials is overly broad. True, there is language in cases like Schick v. NLRB, 409 F.2d 395, 398–399 (7th Cir. 1969), NLRB v. Whiting Milk Corp., 342 F.2d 8, 11 (1st Cir. 1965), and General Drivers Local 229 (Associated Transport, Inc.), 185 N.L.R.B. 631 (1970), to the effect that a union does not commit an unfair labor practice when it discriminates against employees outside of its collective bargaining unit. Despite this language, it is clear that a union may conduct itself in a manner so arbitrary or malicious vis-a-vis an outside group that it exceeds the limit imposed by the duty of fair representation. Brotherhood of Railroad Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952), illustrates this principle. In *Howard,* an all-white union representing brakemen negotiated a contract with their employer which excluded from employment Negro porters, a separate bargaining unit of Negro employees doing essentially brakeman work. The Supreme Court held that an exclusive bargaining agent under the Railway Labor Act cannot eliminate the jobs of non-members of the bargaining unit on the basis of race. Id. at 773–774, 72 S.Ct. 1022. The passenger relations agents' case is closely parallel to *Howard,* especially since their duties were identical to those of the union-member transferees.

---

8. The seniority provisions found in Articles VI(a) and X(b)(18) and the Article II(a) requirement do not by a narrow reading of their terms affect the seniority of the passenger relations agents. These provisions demote the appellants only when superimposed on the tacit agreement between the IAM and TWA that the passenger relations agent jobs would be treated as vacancies and that the persons holding those jobs would be treated as new hires.

9. The appellant Jones testified at trial that the President of Local 1056 told him that it would be "futile" to initiate a grievance or take the union to court.

Thus the district court gave the duty of fair representation too narrow a scope when it assumed that in no circumstance did the IAM have a duty not to discriminate against non-unit members. ˙

■ However, there is a second and more basic flaw in the district court's reasoning. We hold that the non-union-member passenger relations agents were members of the guard unit at least by the time District 142 served the notice of intended changes preceding the negotiations leading to the 1970 contract. The district court's finding that the seniority adjustments under the contract were based on unit membership is thus unsupportable.

■ If the passenger relations agents were not in the guard unit in January, 1970 and prior thereto, the IAM and TWA could not have negotiated their inclusion in the guard unit. Section 2 Fourth of the Railway Labor Act gives the majority of the employees in a ·class "the right to determine who shall be the representative of the craft or class" for the purposes of collective bargaining. 45 U.S.C. § 152 Fourth (1970). Since by hypothesis the passenger relations agents were not in the class for which the union was designated the collective bargaining agent in 1946, the IAM could become their representative only if it was later chosen by them. In other words, the airline and union could not negotiate the inclusion of that separate class into the previously established unit without a showing that the class desired to have the union represent it. Under the same hypothesis, TWA would have violated section 2 Fourth of the Act by requiring that the appellants join a union not of their choosing, and by adversely affecting the appellants' conditions of employment for not having previously joined the IAM.

The IAM did in fact insist that the passenger relations agent jobs were in the guard unit, and in light of the evidence at the trial of this case, its position in this regard was reasonable: the appellants testified that while serving as passenger relations agents they continuously performed guard work.

■ The IAM argues that even if the passenger relations agent jobs were in the guard unit in 1969, the passenger relations agents themselves were not in the unit until they joined the union. The IAM would have us separate guard duties for the purpose of determining its jurisdiction from guard personnel for the purpose of defining its duty to represent the entire unit. This argument is frivolous. Were we to accept it, any union could avoid its duty of fair representation by resorting to the fiction that jobs filled by non-union persons are vacant. The minority unit members would thus be denied the benefit of self-organization without receiving the corollary protection of the duty of fair representation.

■ Since the passenger relations agents were members of the guard unit prior to January 1970, the source of their seniority rights is evident. They were not, as the district court held, employees at will terminable without notice. They were members of the guard unit whose employment rights were determined by the August 1966 and prior agreements between TWA and the IAM. Under those contracts, seniority accrued from the date of their assignment in the job classification involving guard work.

*The Duty of Fair Representation*

■ The one characteristic that distinquishes those transferred into the guard unit in 1970 who were given the highest seniority from the employees who were given lower seniority, but who had performed guard duties all along, is this: the members of the former group all belonged to the IAM before January 1970, while the members of the latter group did not. Discrimination in seniority based on nothing else but union membership is arbitrary and invidious and violates the union's duty to represent fairly all members of the bargaining unit.

The district court supported its decision for the appellees by a finding that there was no proof that the demotion of the appellant employees was predicated on malice. But it is evident that a union may breach its duty of fair representation by actions other than those motivated by anti-minority animus. While it is true that situations in which a union violates its duty have been identified by such phrases as "hostile discrimination," Steele v. Louisville & N. R. R., 323 U.S. 192, 203, 65 S.Ct. 226, 89 L.Ed. 173 (1944); Ferro v. Railway Express Agency, Inc., 296 F.2d 847, 851 (2d Cir. 1961), and "arbitrary, discriminatory," or "bad faith" conduct, Vaca v. Sipes, 386 U.S. 171, 190, 87 S. Ct. 903, 17 L.Ed.2d 842 (1967), these phrases do not delimit specific categories of violations of the duty of fair representation. They only serve to emphasize that the union has broad discretion to adjust the demands of competing groups within its constituency as long as it does not act arbitrarily. Humphrey v. Moore, 375 U.S. 335, 343, 349–350, 84 S. Ct. 363, 11 L.Ed.2d 370 (1964). It is also true that the cases decided in this circuit have for the most part involved union hostility or bad faith, Note, The Duty of Fair Representation: A Theoretical Structure, 51 Texas L.Rev. 1119, 1137 n. 80 (1973), see e. g., O'Mara v. Erie Lackawanna R. R., 407 F.2d 674 (2d Cir. 1969), aff'd sub nom. Czosek v. O'Mara, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970), Ferro v. Railway Express Agency, Inc., supra, Cunningham v. Erie R. R., supra, but bad faith is not universally required to support an employee claim against his union. Bad faith or hostile discrimination is certainly a sufficient condition to evidence an irrational decision, but it is not a necessary condition. It is also sufficient that a distinction be arbitrary or not based on some rational consideration. Steele v. Louisville & N. R. R., supra. In the instant case, the IAM's duty to the appellants was broader than a mere duty not to negotiate the 1970 contract seniority provisions out of hostility toward them. The objective of the duty of fair representation is to provide substantive and procedural safeguards for minority members of the collective bargaining unit.

In reversing, we do not suggest that a union has a duty to dovetail seniority when consolidating two groups of employees. Compare NLRB v. Whiting Milk Corp., supra. Furthermore, it is only coincidental to the outcome in this case that seniority will be reordered to conform to date of job assignment: pre-1970 contracts applicable to the guard unit based seniority on the date of assignment. In another case, a union might base seniority on other considerations. Aeronautical Industrial District Lodge 727 v. Campbell, 337 U.S. 521, 69 S.Ct. 1287, 93 L.Ed. 1513 (1949); Ford Motor Co. v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). We hold only that union membership was not a proper ground for determining seniority.

TWA shares the IAM's responsibility for the injury suffered by the appellant employees. It was the immediate cause of their injury. It displaced their names downward on the seniority roster. It participated in the negotiation of a seniority agreement that resulted in laying off four passenger relations agents in violation of seniority rights accrued under the pre-1970 contracts. It interpreted the 1970 contract, a document fair on its face, according to a tacit understanding with the IAM and so demoted and laid off the appellants. It delayed in informing the appellants of their precarious positions to the prejudice of their ability to preserve their seniority by joining the IAM before TWA announced that their jobs were vacant. TWA cannot take refuge behind the IAM's misfeasance. Its breach of the pre-1970 contracts and the subsequent wrongful discharge of four employees were the direct causes of the appellants' financial injuries. Vaca v. Sipes, supra, at 197. TWA is liable with the union, jointly and severally, for

such damages, if any, as the appellants may prove on remand.

*Statute of Limitations, Laches, Estoppel*

The appellees asserted the defenses of the statute of limitations, laches and estoppel at the trial of this case, and renew them on this appeal. None of these defenses has any merit.

The appellants seek to enforce an obligation arising from the substantive provisions of the Railway Labor Act, but the Act does not specifically limit the period for bringing this type of action. See Abrams v. Carrier Corp., 434 F.2d 1234, 1251 (2d Cir. 1970), cert. denied, 401 U.S. 1009, 91 S.Ct. 1253, 28 L.Ed.2d 545 (1971). The two-year limitations period of section 3 First (r) of the Act applicable to proceedings to enforce the awards of the Adjustment Board does not by its terms apply to a case like this: there is no means of determining the beginning of the section 3 First (r) limitations period in the instant case, since under that section time starts to run only when the Adjustment Board makes an award. 45 U.S.C. § 153 First (r) (1970).

As a general rule, when a federal district court enforces a federal right without a specifically applicable statute of limitations, it looks to the appropriate limitations period of the state in which it sits. This action was brought in the Southern District of New York, so the New York limitations period applies. Section 213(2) of the New York Civil Practice Laws and Rules limits actions on contracts to six years of the time at which they accrue. N.Y.C. P.L.R. § 213(2) (McKinney's 1972). The present action sounds in contract. It seeks to restore the appellant employees to the seniority positions they enjoyed under the pre-1970 collective bargaining contracts. The damages sought are contract damages: lost wages and benefits minus income from outside employment during the lay-off periods. It is conceded by the appellees that the present action was brought within six years of the date on which it accrued, however that date is determined.

The appellant employees did not commit laches in seeking equitable relief. They commenced their action shortly after several of them were laid off. At least six months of the 18-month delay from the time the 1970 contract was signed to the filing of this action is attributable to TWA's delay in effectuating the contract. In any event, in the absence of special circumstances, in determining whether an equitable remedy is timely sought the federal chancellor has "usually permitted his conscience to be controlled quite exactly by the state statutory period." H. M. Hart & H. Wechsler, The Federal Courts and the Federal System 826 (Bator et al. 2d ed. 1973).

Reversed and remanded.