Frank PAPCIN, et al., Plaintiffs,

v.

DICHELLO DISTRIBUTORS, INC., and Teamsters Local 443, Defendants.

Civ. No. B 80–391 (WWE).

United States District Court,
D. Connecticut.

March 16, 1988.

Burton M. Weinstein, Weinstein, Weiner & Shapiro, P.C., Bridgeport, Conn., for plaintiffs.

David Fite Walters, Simon Sumberg, Jules Lang, Lepofsky, Lepofsky & Lang, Norwalk, Conn., for Dichello Distributors, Inc.

Matthew E. Frechette, Roger J. Frechette (Local # 443), New Haven, Conn., David Fite Waters, Lepofsky, Lepofsky & Lang, Norwalk, Conn., for defendants.

## MEMORANDUM OF DECISION

EGINTON, District Judge.

I. *Introduction.*

The plaintiffs are members of defendant Teamsters Local 443 ("443") who claim that

the defendant Dichello Distributors, Inc. breached a collective bargaining agreement by violating its seniority provisions. Defendant union is alleged to have violated its duty of fair representation by participation with or acquiescence to the company in disregarding the seniority rights of the plaintiffs. Jurisdiction is premised on Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a).

This case was tried to the court for 13 days during the period May 20 through September 28, 1987. It has been fully briefed and is now ready for decision. The court files its findings and conclusions pursuant to Federal Rule of Civil Procedure 52(a).

## II. *Findings of Fact.*

### A. Parties.

The former Dichello Distributors, Inc. ("DDI") of Norwalk was a beer distributor servicing customers in Fairfield County. It was owned by the Dichello brothers who also owned Dichello, Inc. ("DI") of Wallingford, a beer distributor which served customers in New Haven County. Though they were separate corporations, they were commonly referred to as Dichello Distributors. In fact, the checks and letterhead of each corporation read "Dichello Distributors." See, e.g., exs. CC, DD, EE and HH. On March 31, 1980, the corporations merged. The surviving entity is Dichello Distributors, Inc. (To distinguish the entities, the surviving corporation shall be referred to as "DD"). Both the Wallingford and West Haven facilities were closed at the time of the merger. DD then opened a new, combined facility in Orange on March 31, 1980.

443 is the bargaining agent for Teamsters in the greater New Haven area. Its sister local, 1040, is the bargaining agent for Teamsters working in beer and soft drink distribution, primarily in Fairfield County. The plaintiffs, while employed by DDI, were members of 1040. They went on strike against DDI in June 1978. DDI moved its Norwalk operation to Wallingford and terminated the plaintiffs. 443 negotiated with the Dichello brothers and 1040 in an effort to retain employment for DDI's former workers. As a result of these negotiations, on August 28, 1978 the plaintiffs came to work for DDI in a West Haven facility, but they became members of 443 as they were now working in New Haven County. When DD opened its Orange facility, the members of 443 at West Haven (the plaintiffs) and the 443 members at Wallingford went to work there together.

### B. Seniority.

This entire dispute is over seniority rights. While the plaintiffs were members of 1040 and employed at DDI they enjoyed as individuals seniority ranging from approximately 4 to 9 years. Ex. 2. An employee's seniority status depends on his date of hire relative to that of his coworkers and is used to determine any number of benefits, including compensation and vacation time. At DDI and DI seniority also determined the order in which the employees selected delivery routes. The most senior employees could select the more profitable routes.

When the plaintiffs were rehired by DDI to work in West Haven they became members of 443, but they retained, relative to one another, the seniority status they had enjoyed in Norwalk. In fact, they selected routes from the seniority list which was in effect while they worked in Norwalk as members of 1040. In 1980, when the plaintiffs began working in Orange, they were as a group placed on a seniority list behind all the members of 443 who had worked for DI at Wallingford. This procedure is called endtailing. Contrast dovetailing, which the plaintiffs argue should have occurred. Dovetailing would have merged the two groups in one seniority list based on each employee's date of hire whether by DI in Wallingford or DDI in Norwalk.

### C. Agreement at the Joint Council Meeting.

The seniority dispute arises out of the settlement of a jurisdiction battle between 1040 and 443. By an agreement among the Dichello operations, 1040 and 443, the plain-

tiffs went to work in 443's jurisdiction and became members of that local. What is less clear is the impact that agreement had, if any, on the plaintiffs' seniority rights.

The contract between 1040 and DDI expired on May 31, 1978. Having failed to negotiate a new agreement, the members of 1040 went on strike. Further, because negotiations between DDI and 1040 during the strike were unsuccessful, DDI moved its operations out of Norwalk to Wallingford. DDI offered jobs to the striking members of 1040 in Wallingford. While 1040 struck the Norwalk facility, DDI began to service its Fairfield County customers from the Wallingford facility, within the jurisdiction of 443. 443 declined to allow members of 1040 to extend their picketing to Wallingford. This led to a dispute between the two locals. Edward Iulo, Secretary–Treasurer of 1040, observed that there seemed to be only two possible solutions: either the strike by 1040 would be recognized by 443 or the striking 1040 men would be given work by DDI within 443's jurisdiction. Ex. C at 29.

In June 1978, DDI offered the striking members of 1040 jobs in New Haven County and notified them that their failure to accept those jobs and report to work by July 12 in Wallingford would result in termination. With some exceptions, the DDI employees initially did not accept work in Wallingford and they were terminated.[1]

1040 President Frank Papcin sought the assistance of the International Union in mediating the dispute, and the problem was referred to an internal union body, Joint Council # 64, to resolve the matter. The Joint Council meeting was scheduled for August 18, 1978. Because the DDI employees had been or were to be terminated, John Sansone, then President of 443, entered in negotiations with the Dichello's prior to the Joint Council meeting to preserve jobs for the 1040 members in 443's jurisdiction, to which DDI had moved all of its operations. Sansone recalls proposing to Iulo that should the plaintiffs accept jobs in 443's jurisdiction they would be

endtailed, but Iulo objected to the proposal. The transcript of the Joint Council meeting confirms that Papcin also had rejected the endtailing proposal prior to the Joint Council meeting. Ex. C at 142.

The Joint Council was successful in finding a resolution to the problem. The parties now disagree as to what that solution was. Specifically, they disagree as to whether any agreement was reached as to endtailing. The Joint Council meeting was heated and disputatious. The transcript is riddled with accusations and denials about who talked with whom between the two locals over what to do with the 1040 members formerly employed by DDI. It appears that all concerned knew that the 1040 members had work available to them in 443's jurisdiction for DDI; however, it was not clear whether they would work under the collective bargaining agreement in place between 443 and DI. The main concern of the 1040 leadership was whether their men would continue to work under their contract in 443's jurisdiction. Iulo said:

> The only problem they [the plaintiffs] have is that if they work under the present agreement [between 443 and DI] which works successfully in Wallingford which, I think, is a good agreement but it doesn't work up there because of "X" amount of conditions it won't work at all with these people and I think it's understood by Local 443 that it's a different situation, problem, by the employer too but to come into an area after working under a contract for three years without having negotiated anything whatsoever.... I personally can't and will not oppose it if the people refuse to accept another agreement because it's completely different there, the working conditions.

Ex. C at 95–6. Papcin had earlier represented that his men would insist on voting on any contract under which they worked. *See, e.g.,* ex. C at 92–3. Vincent (Chicky) Piasano vehemently objected, apparently believing that the 1040 members would

---

1. Although DDI initially offered work to the plaintiffs in Wallingford, they were ultimately employed by DDI in a West Haven facility at the time they decided to return to work.

only disrupt the 443 contract with DI. Ex. C at 136–7.

At many points during the meeting, during a discussion as to whether the plaintiffs could come under 443's jurisdiction with their current contract, reference is made to the plaintiffs coming to work in 443's jurisdiction "with their seniority." See Ex. C at 94, 136–137, 139, 142, 148–9 and 152. Because seniority was only tangentially the subject of the discussions before the Joint Council, none of the participants focused on what the term means. In the context of this jurisdiction dispute, however, only one interpretation makes sense.

443 is a larger and probably stronger local than 1040. No one argues that it had any obligation whatsoever to intercede for 1040 in negotiations with DDI and DI, and, more importantly, that it had any obligation to help 1040 members gain employment with DDI in New Haven County. By doing so and allowing the former 1040 members to continue to work under the contract they had worked under in Norwalk (the "Fairfield Agreement"), 443 helped preserve jobs for the 1040 members in a fashion which the 1040 members could find acceptable. It is inconceivable that 443 would allow new members of its local (albeit former members of a sister local) to maintain seniority they had accrued in another jurisdiction to the detriment of its current members when it had neither an obligation nor an incentive to do so.

The transcript of the Joint Council meeting supports this conclusion. The primary concern of the 1040 officers was whether their members could continue to work under the Fairfield Agreement. Ex. C at 136—145. Once that issue was resolved, the meeting concluded on a note of reconciliation. All the references to 1040 members going to work in New Haven County as members of 443 "in order of their seniority" apparently mean that they would not be hired at DDI in West Haven as new employees for all purposes. Ex. C at 139, 142. They would, relative to one another, retain the seniority they had enjoyed at DDI in Norwalk. Specifically, Chicky Piasano said, "[t]hey go to work in order of

their seniority whether 10, 20 or 50 [years] and they come to work with their years of service for vacations...." Ex. C at 142. What this statement means is that the Norwalk seniority *order* would be preserved, but the years of service would matter only for computing vacation time. The Dichello brothers agreed, at 443's insistence, to honor vacation time the plaintiffs had accrued as members of 1040 working for DDI in Norwalk. Because vacation time is only one of many benefits which flow from seniority, there is no other reason for Piasano to have made the distinction he did.

The Joint Council Chairman Fred Roberto echoed Piasano when he attempted to summarize the emerging agreement: "From [what] I hear the door has been opened to allow the people in order of their seniority to go to work in Wallingford and to come in under the Schaeffer contract [the new Fairfield Agreement], not the [old] Fairfield County contract...." Iulo responded: "What the representatives from 443 have just stated would be more than I would have expected to possibly get. Of course it would be totally acceptable." Ex. C at 144. Iulo elaborated on why the proposal was such a breakthrough by explaining that he had previously misunderstood whether the 1040 members could work in New Haven County under their existing contract. *Id.* The transcript does not show that Iulo ever raised a question about seniority at the meeting. At trial he testified in effect that his understanding was that the 1040 members would be dovetailed with 443 members on seniority lists for all purposes. Given that 443 officials and their counsel Norman Zolot had consistently proposed endtailing prior to the Joint Council meeting, it is unclear where Iulo's perception arose. His testimony that it was all agreed to in discussions which were never recorded on the transcript is hearsay and, more importantly, not credible. Tr. 6/4/87 at 25–38. At least, one supposes, he would have sought on the record to have the issue clarified in light of 443's clear position on endtailing.

At the conclusion of the meeting, Michael Allen, a Joint Council member, transcribed the terms of the agreement which read in

part: "All regular full-time employees from the Norwalk Terminal will be afforded work in the jurisdiction of Local 443 with all of their seniority rights in order of their seniority to do the work that may be available." Ex. C at 152. The plaintiffs read this language literally and argue that where it says "all ... seniority rights" it cannot be limited to ordering or vacation time. The difficulty with such a reading is that it makes no sense in the context of discussions at the Joint Council meeting which lasted 6 hours and cover 150 pages of transcript.

The claim of Papcin and Iulo at trial that they interpreted the seniority agreement differently than did the Piasanos is not a matter of simple misunderstanding. Because Papcin and Iulo were familiar with 443's insistence on endtailing (and because there seems to be no reason why 443 would abandon its position), their current explanation is not credible. In fact, 443's counsel, Normon Zolot, a labor attorney with a great deal of experience and a good reputation of long standing, testified that the day before the Joint Council meeting he phoned Iulo and Papcin separately to tell them of the proposed endtailing, among other aspects of 443's proposal to retain jobs for the plaintiffs. Tr. 9/28/87 at 45.

After the Joint Council meeting, the plaintiffs reported to work for DDI in West Haven. Zolot prepared a Memorandum of Agreement dated September 25, 1978, to reflect the agreement reached at the meeting. It was posted in West Haven and read in part: (Ex. D)

> The West Haven, Conn. operations subject to the Wallingford, Conn. agreement and in the event the Company shall transfer all of its work into one location, a new seniority list shall be established and the Wallingford employees employed as of August 28, 1978 shall be placed at the top of the new seniority list, and the balance of those employees and those of the West Haven, Conn. operation shall be merged on the basis of seniority at the

West Haven, Conn. or Wallingford, Conn. commencing August 28, 1978.

Upon seeing this memo, Papcin filed a grievance with 443 which was denied. He also filed unfair labor practice charges with the National Labor Relations Board ("NLRB"). The NLRB declined to bring charges against 443. The NLRB Regional Director stated that in his view the endtailing procedure was legitimate and did not violate Section 8(b)(1)(A) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(A). Ex. I. The NLRB denied Papcin's appeal. Ex. K.

### D. Post–Joint Council.

Because the compensation structure of the Fairfield Agreement pertained to rear loading trucks, each plaintiff remained under that agreement in West Haven until he was given a side loading truck. Side loaders are easier to work with and allow a driver to deliver more product. Once side loaders were put in operation at West Haven, the men were compensated under the collective bargaining agreement in place between 443 and DI. This transition was complete by January 1979. After January 1979 all employees of DI and DDI, including the plaintiffs, were working under the same contract.

The 443 contract expired on January 31, 1980. Prior to that date, 443 entered into negotiations with Dichello to prepare a new contract. Many of the plaintiffs attended a 443 meeting on January 5, 1980 at which 443's business agent Felix Del Guidice addressed seniority.[2] He told the membership that once the anticipated merger occurred and the Orange facility opened, seniority would be as had been agreed in August 1978 and as was set out in the Memorandum of Agreement: the West Haven men would be endtailed behind the Wallingford men on a combined seniority list. Stipulation of Fact at 12; Tr. 7/15/87 at 161.

---

**2.** In their post-trial brief plaintiffs contest whether the question of seniority was discussed at this meeting, but this contradicts their admission in a stipulation of fact which plaintiffs' counsel signed during trial. *Compare* Plaintiffs' Trial Brief, para. 18 at 11 and Stipulation of Fact, para. 54 at 12. The facts to which the parties have stipulated will be taken as true.

Another meeting was held on January 26, 1980 at which the Dichellos' contract proposal was rejected by the 443 membership. Seniority was not mentioned. Tr. 7/15/87 at 173. On January 31, the members voted to strike. After some further negotiation, Del Guidice brought another proposal to the striking members which was accepted on February 9. The contract was back dated[3] to February 1 to reflect the date on which they had agreed the new contract would take effect. Ex. 1, article XIX. At the same time a Letter of Understanding between Burton Zempsky for DI and DDI and John Sansone for 443 was executed and back dated to January 31, 1980. In its entirety it read:

> The memorandum of Agreement [sic] between Dichello, Inc. and Dichello Distributors, Inc. and Local # 443, dated September 25, 1978 will remain in effect after the Wallingford and West Haven operations have been combined and after the corporations have merged.

Ex. L. This letter was posted at DDI's West Haven facility and later in Orange when that operation opened.

Delivery route assignments had been selected by drivers at West Haven and Wallingford from their respective seniority lists to cover a period of time through March 1980, therefore, when the two facilities closed and combined in Orange on March 31 there was no need immediately to alter route selections. A combined seniority list was posted upon the commencement of business in Orange and it reflected the endtailing. Selections for routes to begin April 1 were made from the combined list.

Some of the plaintiffs filed grievances again to contest the endtailing. Del Guidice denied the grievances. Papcin again filed unsuccessful unfair labor charges with the NLRB; his appeal was also denied. After the NLRB declined to file a complaint, the plaintiffs yet again filed a grievance with 443 which Del Guidice denied, believing as he had with the prior grievances that it was without merit.

The plaintiffs commenced this action August 15, 1980.

### III. Conclusions of Law.

This is a hybrid Section 301/breach of duty action by union members against their union and employer. The plaintiffs allege that DD breached the collective bargaining agreement executed on February 9, 1980 and that 443 breached its duty of fair representation. An employer may be sued in federal court directly by union members for breach of a collective bargaining agreement under Section 301 of LMRA, 29 U.S. C. § 185(a). A claim against the union for breach of its duty of fair representation may be joined in the same action. *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1975); *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

### A. Standard.

The implied obligation of a union to fairly represent its membership arose in the Railway Labor Act discrimination cases. *Tunstall v. Brotherhood of Locomotive Firemen & Enginemen*, 323 U.S. 210, 65 S.Ct. 235, 89 L.Ed. 187 (1944); *Steele v. Louisville & Nashville Railroad Co.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). The same obligation is imposed on bargaining agents under the National Labor Relations Act, Sections 7 and 9(a), as amended, 29 U.S.C. §§ 157, 159(a). Because Congress empowered laborers to bargain collectively and be represented in that process by agents, those agents are bound to act in a fair and non-discriminatory manner. *Hines, supra* 424 U.S. at 564, 96 S.Ct. at 1056; *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1952).

Bargaining agents are afforded a great degree of leeway in representing bargaining units. *Hines, supra* 424 U.S. at 563–4, 96 S.Ct. at 1055–6. Not surprisingly, the standard to which they are held is forgiving:

---

**3.** In the case where a collective bargaining agreement is approved after the expiration of the prior agreement, it is often back dated to indicate that the parties intend for it to take effect retroactively upon the expiration of the prior agreement. Tr. 7/17/87 at 41–2.

A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith.

*Vaca, supra* 386 U.S. at 190, 87 S.Ct. at 916. By having determined that grievances filed by the plaintiffs were without merit, 443 is alleged to have breached this obligation.

DD correctly states that its liability depends upon a finding that the union breached its duty. *United Parcel Service, Inc. v. Mitchell,* 451 U.S. 56, 62, 101 S.Ct. 1559, 1563, 67 L.Ed.2d 732 (1980); *Hines, supra* 424 U.S. at 570-1, 96 S.Ct. at 1059. Therefore, whether either party is liable depends on how the seniority provision in the contract between DD and 443 is construed.

B. Seniority Provision.

The collective bargaining agreement between 443 and DD, ratified on February 9, 1980, contains the following seniority provision:

> Preference will be given to employees older in service and in order of their seniority to the amount of work available, provided that such employees are available at the time such work is assigned and are qualified to perform such work. This preference shall be measured over the course of and shall not extend beyond a normal week's work.

Ex. 1, article VII, item 1.[4] The plaintiffs argue that this provision entitles them to select delivery routes in the order of seniority based on their date of hire by DDI in Norwalk. They argue that the collective bargaining agreement is silent on endtailing. Therefore, when the Orange operation opened, their seniority should have been dovetailed with that of the 443 members from Wallingford. In support of this proposition they point to article II of the collective bargaining agreement, which at item 2 reads:

The Employer shall not enter into any agreement or contract with his employees, individually or collectively, or with any officer/or representative of the Union, which in any way conflicts with the terms and provisions of this Agreement. Any such agreement or contract shall be null and void.

Ex. 1. The plaintiffs argue that this provision negates the Memorandum of Agreement, Ex. D, and Letter of Understanding, Ex. L, which reflect the agreement on seniority reached at the Joint Council meeting on August 18, 1978. The court does not see the conflict.

Construction of labor contracts is a matter of federal law. The courts are concerned with effectuating the parties' intent and promoting the uniform development of federal labor law. A primary goal of the latter policy is to foster by deference the private ordering and dispute resolution aspects of the collective bargaining process. *See, e.g., United Auto Workers v. Hoosier Corp.,* 383 U.S. 696, 702, 86 S.Ct. 1107, 1111, 16 L.Ed.2d 192 (1966). Therefore, where it appears in light of surrounding circumstances and the subsequent conduct of the parties that the bargaining agent has negotiated the terms of a collective bargaining agreement in good faith the court will not disturb the results.

The seniority provision in the contract between DI and 443 during the period when the plaintiffs were terminated by DDI in Norwalk and later hired in West Haven, Ex. 8, is identical to the seniority provision in the contract ratified by 443 in February 1980. Ex. 1. The term does not address endtailing because at the time the first contract was drafted, a merger of the two companies does not appear to have been contemplated. At the time that it was agreed that the plaintiffs would join 443 and go to work for DDI in West Haven, two problems arose which were not ad-

---

4. The contract ratified by 443 in February 1980 was signed by Burton L. Zempsky, Executive Vice President for DDI and DI. The contract reads that it is between 443 and "Dichello Distributors." Zempsky testified that the contract covered both DI and DDI until the merger at which time DD, named as "Dichello Distributors, Inc.," assumed the obligations of its predecessors. Tr. 5/27/87 at 11-14; Ex. 1 at article XIX. This opinion will refer to DD as the signatory to the February 1980 agreement.

dressed in the current 443 contract. The first was compensation for the plaintiffs who would begin work for a Dichello company in 443's jurisdiction on rear loading trucks. The method of payment in the industry differs depending on the type of truck used. By the agreement reached at the Joint Council meeting and memorialized in the Memorandum of Agreement, 443 agreed with DI and DDI that the plaintiffs would be compensated in the same fashion they had been under the Fairfield Agreement negotiated by 1040. Once each plaintiff received a side loading truck, regardless of when, his compensation would be determined under the 443 contract with DI. The second problem was seniority. At the time of the Joint Council meeting, a merger of DI and DDI was anticipated. The 443 contract protected seniority rights based on simple longevity; it did not contemplate the merger of two shops with different seniority scales. The parties agreed at the Joint Council meeting, as the Memorandum of Agreement further reflects, that upon merger the plaintiffs would be endtailed behind the current 443 membership. The significance of this arrangement is that the delivery routes are selected in order of seniority.

The plaintiffs argue that they agreed to drop pending unfair labor practice charges before the NLRB in exchange for retention of their seniority rights for all purposes. The Joint Council meeting transcript, the Memorandum of Agreement and the relative positions of the parties at the time do not support this interpretation. 443 had no incentive to agree to dovetailing its current membership with newly hired members from a sister local. While DDI may have wished to avoid NLRB charges, it could not have agreed to a modification of the seniority provision that 443 opposed. The transcript of the Joint Council meeting and the testimony of John Sansone evidence 443's unswerving adherence to endtailing as a condition under which the plaintiffs could come to work under its contract.

When the 443 contract expired in January 1980, the union held a series of meetings to discuss proposals for a new agreement. Seniority was specifically discussed at the first such meeting, and 443's bargaining agent made clear that it would remain as it was outlined in the Memorandum of Agreement. A Letter of Understanding was drafted to continue that agreement. Although 443 had already denied grievances filed by Papcin on the seniority question and the NLRB had found no evidence that 443 had committed an unfair labor practice in negotiating the seniority agreement, the plaintiffs were silent at the contract meetings. They were fully aware of the interpretation 443 officials gave the seniority provision, but evidently believed that when confined to its four corners it gave them seniority rights beyond endtailing. Raising the issue, Papcin testified, would "voluntarily open up the kettle of worms," so he remained silent and instructed the others to do the same. Tr. 5/21/87 at 41-2. During the prior day of trial, however, Papcin testified that he probably had raised the seniority issue at the 1980 contract meetings: "I probably bring it [seniority] up at every meeting I have a chance to." Tr. 5/20/87 at 45. Papcin's inconsistency on this pivotal point undermines his credibility.

The court finds that the seniority provision of the February 1980 agreement is not in conflict with the Memorandum of Agreement. Instead, it modifies the seniority provision in order that it might have a meaningful application to changed circumstances. By its own terms the Memorandum of Agreement is effective beyond the effective dates of the contract which it supplemented, but the Letter of Understanding explicitly carried it forward and applied it to the February 1980 contract. More importantly, the plaintiffs knew this to be the case when they voted to ratify the 1980 agreement.

Negotiating seniority provisions is a duty uniquely within the province of the bargaining agent. The union is free to renegotiate seniority provisions. *See, e.g., King v. Space Carriers, Inc.,* 608 F.2d 283 (8th Cir.1979). The only limitation on that power is its obligation to treat all members fairly:

Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. *Huffman, supra* 345 U.S. at 338, 73 S.Ct. at 686. The Second Circuit has noted: "we do not suggest that a union has a duty to dovetail seniority when consolidating two groups of employees." *Jones v. Trans World Airlines, Inc.,* 495 F.2d 790, 798 (2d Cir.1974). The plaintiffs elected to accept work at DDI in West Haven under terms previously negotiated by 443, DDI and DI with 1040's participation. The endtailing agreement was clearly continued in the 1980 agreement for which they voted.

The plaintiffs argue, however, that 443 could not have agreed to endtailing without breaching a duty owed to them. In support of this view they rely on *Teamsters Local 42 v. NLRB,* 825 F.2d 608 (1st Cir. 1987), which they assert has "uncanny similarities" to this case. Plaintiff's Reply Mem. at 4. *Local 42* involved a local representing employees at two shops which operated under separate contracts. The employer announced plans to merge the shops in a third location. Without much canniness, the similarities end there.

One shop had unionized more recently than the other. When it came time to negotiate seniority for the combined facility, the local refused to consider dovetailing, and, instead, negotiated an agreement whereby union members in the more senior shop would be placed before the members in the less senior shop on the combined seniority list. Finding that the local breached its duty of fair representation, the court emphasized that at the time of the contract negotiation both shops were represented by the local. *Id.* at 614. Furthermore, the court noted, no breach would have occured had the endtailing been negotiated prior to the unionizing of the latter shop:

> Endtailing there—at an existing facility, earlier unionized—was altogether consistent both with [the employer's] established practice and with the collective bargaining agreement in effect [at the more senior shop].

*Id.* at 613–614. At the time the dovetailing proposal was made to the union and rejected, the local had "long since undertaken to represent [the less senior] warehousemen." *Id.* at 614.

*Local 42* relied on *Jones, supra,* for the proposition that a local may not discriminate among its members on the basis of seniority alone. *Local 42* at 612. *Jones* involved a suit by airport workers who lost seniority under a contract renegotiated by their union. The plaintiffs had been employed as non-union guards when they were required to join the local at the time the union renegotiated its contract for airport workers. The plaintiffs, who continued to work in their same jobs, were treated under the union contract as new employees on the day they joined the union. The court held that the union breached its duty of fair representation, rejecting the district court's conclusion that the union owed no duty to the plaintiffs:

> We hold that the non-union-member passenger relations agents were members of the guard unit at least by the time [the union] served the notice of the intended changes preceding the negotiations leading to the ... contract.

*Jones* at 797.

Both *Local 42* and *Jones* involved the failure of a union to consider anything but duration of union membership when negotiating contractual seniority rights for its members. The union in each case was found to have impermissibly succumbed to the desires of senior factions within the bargaining units. This practice is arbitrary and violative of the duty of fair representation.

443 had no duty to protect seniority for the former members of its sister local and the former employees of DDI. Furthermore, the plaintiffs' reliance on *Local 42* and *Jones* cannot be squared with this court's interpretation of the agreement reached by the parties at the Joint Council meeting and which the plaintiffs later ratified during contract negotiations in 1980.

In denying each of the plaintiffs' requests to file unfair labor practice charges, the NLRB opined that endtailing was with-

in 443's traditional practice, that it was legitimately based on the seniority within the bargaining unit and that it was neither arbitrary nor unfair. *See* exs. I, K, Q and S. After review of the testimony and the evidence, the court agrees with the findings of the NLRB, which standing alone would be entitled to considerable weight. *Berard v. General Motors Corp.*, 493 F.Supp. 1035, 1040 (D.Mass.1980).

## IV. *Conclusion.*

Because the court finds that 443 did not breach its duty of fair representation, judgment shall enter in favor of the defendants. SO ORDERED.