850 F.2d 1255
 128 L.R.R.M. (BNA) 2793, 109 Lab.Cas. P 10,597
 L. Lee BEARDSLY, Appellant,
v.
CHICAGO & NORTH WESTERN TRANSPORTATION CO., et al., Appellees.
Francis E. AMIOT, Appellant,
v.
CHICAGO & NORTH WESTERN TRANSPORTATION CO., et al., Appellees.
John E. REECE, et al., Appellants,
v.
CHICAGO & NORTH WESTERN TRANSPORTATION CO., et al., Appellees.
Jack L. CHAMBERS, et al., Appellants,
v.
CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, et al., Appellees.
Roger L. SWIFT; Oscar D. Overton; W.R. Urton; Robert W.
Luth; Mark R. Pomery; David G. Dickey; Terry B.
Turvold and Clyde R. Thomas, Appellants,
v.
CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY; United
Transportation Union, an unincorporated labor organization;
and The Brotherhood of Locomotive Engineers, an
unincorporated labor organization, Appellees.
Harold L. KING; James L. Knox; Steven Arthur Newton;
George R. Etherton; Larry L. Williams; John F.
Keith; and Joseph A. Rush, Appellants,
v.
CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY and The
United Transportation Union, an unincorporated
labor organization, Appellees.
Vane NEWTON; Robert R. Bailey; Wayne A. Moore; Robert L.
Duncan; Harold E. Johnson; Donald L. Kidd, Sr.; H.L.
Kidd, Jr.; B.J. Rude; Max A. Eads; Jack E. Brown; Milton
E. Capps; Wilbur Stanton; J.W. Burke, Jr.; E.D. Snyder;
Daniel V. Middour; Donald P. McCaleb; Sam H. Dean; Donald
E. Bisgaard; Robert W. Shaner; LaDon E. Crane; Roger L.
Rothamel; Arnold M. Scheel; Frank M. Ramey; A.M. McQuade;
Lloyd G. Andrews; Richard D. Thorsland; John R. Vincent;
Stephen R. Early; Leo T. Seehan; and Richard A. Nitcher;
John E. Beghtol; Dennis E. Chaplin; Paul W. Strawn; Max
R. Williams; David Yackle; Francis E. Amiot; James F.
Ramsey; Allan P. Sherling; Jerry E. Payne; Richard A.
Clark; Kenneth W. Brevig; Stephen D. Rosentangle and
William H. Rosentangle, Appellants,
v.
CHICAGO AND NORTHWESTERN TRANSPORTATION COMPANY; United
Transportation Union, an Unincorporated Labor Organization;
and Brotherhood of Locomotive Engineers and Unincorporated
Labor Organization, Appellees.
Angeline V. BOLL, Robert J. Tollakson and Dennis L. Stowe, Appellants,
v.
CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, and
Brotherhood of Railway, Airline and Steamship Clerks,
Freight Handlers, Express and Station Employees, an
unincorporated labor organization, Appellees.
 Nos. 86-1369, 86-1370, 86-1372 to 86-1374, 86-1950 and 87-1325.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Aug. 31, 1987.
Decided June 15, 1988.
Rehearing En Banc Denied June 20, 1988.
Rehearing and Rehearing En Banc Denied Sept. 14, 1988.
 
 Bruce H. Stoltze, Des Moines, Iowa, for appellants.
 Ralph J. Moore, Washington, D.C., Norton N. Newborn & Harold Ross, Cleveland, Ohio, for appellees.
 Before HEANEY, BOWMAN and WOLLMAN, Circuit Judges.
 HEANEY, Circuit Judge.
 
 I. OVERVIEW
 
 1
 One hundred fifty-eight former employees of the Chicago, Rock Island and Pacific Railroad (Rock Island or Rock Island Railroad) appeal from decisions of the United States District Court for the Southern District of Iowa dismissing or denying their claims against the Chicago & Northwestern Transportation Co. (CNW) and four railroad labor organizations.[1] The suits allege violations of a labor protective agreement and a United States statute, both designed to protect the job status of the former Rock Island employees.
 
 
 2
 We affirm the district court insofar as it dismissed several of the actions for lack of jurisdiction. We reverse the district court's denial of appellants' request to vacate an arbitration decision between the CNW and the United Transportation Union (UTU) regarding former Rock Island ground service employees. We find that the terms of the October 22, 1980 seniority implementing agreement as affirmed by the arbitrator are invalid and direct that they be renegotiated. Finally, we hold the remaining employees have a right to arbitration, subject to the right of the CNW and the appellee unions to assert the defense of laches.
 
 II. FACTUAL BACKGROUND
 
 3
 A. Attempted Reorganization, Interim Operation and Purchase of the Rock Island Railroad
 
 
 4
 In 1975, the Rock Island Railroad commenced reorganization proceedings. These efforts were unsuccessful. In September of 1979, the Interstate Commerce Commission (ICC) concluded that Rock Island had insufficient cash assets to continue its operations "in the face of national transportation requirements." On March 18, 1980, the ICC granted the CNW authority to conduct temporary operations over certain Rock Island lines from March 24 until May 31, 1980.[2] The ICC subsequently authorized the CNW to continue providing interim service over those lines until June 20, 1983, at which time a United States Bankruptcy Court approved the sale by the Rock Island trustee to the CNW of the lines upon which it had been conducting interim service.
 
 B. The March 4th Agreement
 
 5
 On March 4, 1980, thirteen railroads who were operating or contemplating operations on Rock Island lines, including the CNW, entered into a labor protective agreement[3] with national representatives of rail labor organizations, including the national representatives of appellee unions involved in the present action.
 
 
 6
 The March 4th Agreement was designed to ease a potentially troublesome transition. The acquiring railroad agreed to make accommodations in terms of providing rights of first hire and seniority to the employees of the acquired company. In exchange, the international unions agreed to assure labor peace during the transition. Specifically, the stated purpose of this agreement was to provide:
 
 
 7
 a fair, equitable and complete arrangement for protection of ... Rock Island employees taken into the employ of interim service operators and purchasing carriers signatory hereto and to enable the interim service operator or purchasing carrier to be operated in the most efficient manner, as set forth herein, immediately upon authorization for such operation.
 
 
 8
 March 4th Agreement at 1.
 
 
 9
 Article II of the Agreement provides that the purchasing carrier shall determine by craft its necessary additional manpower requirments "due to its taking over ... [the] Rock Island lines." Id. at 3. The acquiring carrier further agreed to provide a detailed explanation of these needs, to "discuss" its requirements with representatives of the crafts employed by both the acquiring and acquired railroad, and to extend to employees of the acquired railroad the right of first hire in all work stemming from the acquistion. Id. This right of first hire was to accrue to employees in order of their seniority.[4]
 
 
 10
 Article II, section 9, of the Agreement sets forth procedures to determine job seniority for former Rock Island employees hired by the CNW. It states:
 
 
 11
 [A]greements will be reached on each purchasing carrier concerning the manner in which seniority will be allocated in filling additional job assignments, between the purchasing carrier's employees and the bankrupt carrier employees hired by the purchasing carrier.
 
 
 12
 C. The Rock Island Railroad Transition and Employee Assistance Act--RITEA
 
 
 13
 On May 30, 1980, the President signed into law the Rock Island Railroad Transition and Employee Assistance Act (RITEA) Pub.L. No. 96-254, 94 Stat. 399 (1980) (codified as amended at 45 U.S.C. Sec. 1001 et seq.). The purpose of this act was twofold: (1) to protect the interests of former Rock Island employees and (2) to protect the railroads against labor strife and ensure continued operation of the lines formerly controlled by the Rock Island railroad.[5]
 
 
 14
 Section 105 of the Act, 45 U.S.C. Sec. 1004, entitled "Railroad Hiring," provides a broader right of first hire than the March 4th Agreement. Where the March 4th Agreement limits the right of first hire to work stemming from the acquistion of the Rock Island, RITEA provides a blanket right of first hire to former Rock Island employees.[6] Specifically, it states that former employees of the Rock Island:
 
 
 15
 shall, unless found to be less qualified than other applicants, have the first right of hire by any other rail carrier that is subject to regulation by the [ICC] for any vacancy that is not covered by [an affirmative action plan].
 
 
 16
 45 U.S.C. Sec. 1004 (emphasis added).
 
 
 17
 On January 14, 1983, the arbitration provision of the Regional Rail Reorganization Act, 45 U.S.C. Sec. 797c(g), was amended to subject disputes regarding the right of first hire under RITEA to mandatory arbitration. See Rail Safety and Service Improvement Act of 1982, Pub.L. No. 97-468, Sec. 235, 96 Stat. 2543, 2547 (1983). Prior to this time, an action could theoretically be brought in federal court to enforce this right. See Brotherhood of Locomotive Engineers v. Burlington Northern, 580 F.Supp. 797 (D.Colo.1984).
 
 
 18
 D. Propriety of Implementing Agreements Negotiated Under the March 4th Labor Protective Agreement
 
 1. Factual Background
 
 19
 To understand appellants' claims concerning the validity of the implementing agreements negotiated under the authority of the note of certain circumstances surrounding the negotiation of these agreements. Specifically, the effect of the closing and consolidation of local unions must be understood, as well as obligations imposed on the negotiating unions by their own constitutions.
 
 
 20
 a. National Unions Close Down Local Rock Island Locals
 
 
 21
 Shortly after the March 4th Agreement and RITEA went into effect, the international unions here involved closed down or consolidated many of the locals serving former Rock Island employees. They maintain these closings or consolidations were an economic necessity because members had ceased paying dues. See Affidavit of Robert L. Hart, 5 Joint Appendix 1057, 1057-58. The appellants maintain that the closing or consolidation of the locals resulted from a conspiracy among the international unions, the CNW, and the local unions representing CNW employees to undermine the bargaining strength of the former Rock Island employees. See generally, 1 Joint Appendix 16-130. As evidence of this, they note that local union officials were unavailable to file grievances and that representatives of the internationals engaged in a pattern of falsely assuring former Rock Island employees that action would be taken on grievances. Id. Further, appellants maintain that in the confusion and consolidation, they were not informed of the safeguards, such as the March 4th Agreement and RITEA, enacted to assure their job-related rights. Id. Whatever the reasons for the closings or consolidations, they clearly made it more difficult for the former Rock Island employees to understand their rights and to determine whether they were being adequately protected by their internationals.
 
 
 22
 b. The United Transportation Union Constitution
 
 
 23
 Article 85 of the United Transportation Union (UTU) Constitution[7] provides that the General Chairman empowered to make a "systems" agreement, such as the implementing agreements involved in the present dispute, must poll the "affected Local Chairmen", i.e. the Chairmen for the CNW employees and the Rock Island employees, prior to signing such an agreement and be governed by the majority of votes cast. Moreover, in negotiating such agreements, the seniority of employees of acquired railroads is to be preserved to "the extent possible".[8] In addition, Article 90 mandates that all intra-union disputes surrounding an acquisition or merger be resolved internally by the union. This ensures that a unified position can be established with respect to these disputed issues and preserves internal union authority over the interpretation of its constitution.[9]
 
 
 24
 2. Negotiation of the Implementing Agreements
 
 
 25
 Pursuant to Article II of the March 4th Agreement, the CNW sought to conclude implementing agreements with respect to the relative seniority rights of its employees and the former employees of the Rock Island Railroad it had hired. Although the CNW did involve the union representatives of the former Rock Island employees in preliminary discussions, these representatives were not present when the final agreements were reached, were not parties to these agreements, and had virtually no control over the terms of these agreements.
 
 
 26
 Final implementing agreements with engine service employees represented by the Brotherhood of Locomotive Engineers (BLE) and the UTU were signed by the CNW General Chairmen for the BLE and the UTU on February 16, 1982. See 7 Joint Appendix 1399.
 
 
 27
 On October 22, 1980, the CNW and two UTU General Chairmen of the Committee of Adjustment for the CNW--G.R. Maloney and Thomas Q. Ryan--signed an interim agreement. This agreement determined the relative seniority rights of former Rock Island employees and employees of the CNW in terms of ground service work.
 
 
 28
 3. Arbitration of UTU Rock Island Ground Service Employees
 
 
 29
 a. The Arbitration Proceeding
 
 
 30
 On April 15, 1981, the General Chairman of the Committee of Adjustment for UTU Rock Island, Ralph Tambaro, sent a letter to the CNW objecting to the October 22, 1980 interim implementing agreement insofar as it related to ground service employees. See 7 Joint Appendix 1437. He objected, in part, because the agreement had been reached without the participation of the union representatives of former Rock Island employees and, in part, because it failed to give Rock Island employees seniority rights to which they felt entitled under the March 4th Agreement. Tambaro demanded arbitration pursuant to Article II, section 9(b) of the March 4th Agreement. On May 4, 1981, the CNW received a second letter from Fred Hardin, the International President of the UTU, seeking to invoke the same arbitration procedure on behalf of former Rock Island ground service employees. On May 18, 1981, Hardin by letter indicated that R.M. Crago, UTU International Vice President, would represent the UTU's Rock Island employees in the arbitration, but would not act as a representative of the international union.
 
 
 31
 Next, the CNW and CNW-UTU filed suit to stop this arbitration and succeeded in delaying it for approximately one and one-half years. See Chicago and Northwestern Transportation Co. v. United Transportation Union, C.A. 81-2472 (D.D.C.); see also Supplemental Affidavit of Robert W. Schmiege, 7 Joint Appendix at 1496. Thereafter, the arbitration went forward. The CNW and representatives of the Rock Island and the CNW ground service employees participated in the arbitration, which was conducted between February 23 and 25, 1983, by a neutral arbitrator appointed by the National Mediation Board. See Arbitration Board No. 406, Matter of Arbitration Between the Chicago and Northwestern Transportation Company and The United Transportation Union, at 2 (May 20, 1983) (Arbitration) (see 2 Joint Appendix 267). Although the UTU constitution required the union to enter the arbitration with a unified position, the arbitration consisted of a contest between the Rock Island UTU representatives and the CNW-UTU representatives, with the international union playing no significant independent or authoritative role.
 
 
 32
 b. The Tucumcari Case
 
 
 33
 Shortly after the matter was submitted to arbitration, but several months before the arbitrator rendered a decision, a relevant internal dispute was being resolved within the UTU. In UTU Board of Appeals Case No. 64, File 8-8-54 (March 11, 1983) (Tucumcari ) (see 2 Joint Appendix 441), former employees of the Rock Island challenged an implementing agreement quite similar to those involved in the case before us.
 
 
 34
 In Tucumcari, a segment of the former Rock Island railroad called the Tucumcari line had been purchased after a period of interim operation by the St. Louis Southwestern Railroad (SSW) on March 24, 1980. Pursuant to the terms of the March 4th Agreement, a subsequent implementing agreement was reached purporting to establish a seniority scheme for the former Rock Island employees.
 
 
 35
 The implementing agreement was signed by General Chairman R.H. Arnett, on February 23, 1982. Arnett was the representative of the SSW-UTU, the acquiring company's union, and had never represented Rock Island employees. As in the present case, the agreement gave former Rock Island employees seniority dates as of their first day of work for the SSW.
 
 
 36
 Two former Rock Island employees, J.W. Volkman and J.T. Kelso, brought an internal appeal within the UTU. They alleged that the implementing agreement was contrary to the terms of the March 4th Agreement. They argued, inter alia, that the agreement was improper because Arnett represented only employees of the acquiring company and not the Rock Island employees. They also maintained that the March 4th Agreement contemplated greater seniority rights than were provided by the February 23, 1982 implementing agreement.
 
 
 37
 The Board of Appeals held for Volkman and Kelso and, in reforming the terms of implementing agreement, stated that "all employee representatives" should participate in the negotiation of implementing agreements. Id. at 16. Second, the Board found that the former Rock Island employees were entitled to a seniority date as of the day they were hired by the Rock Island. Specifically, the Board stated:
 
 
 38
 In this case of acquisition, prior rights are of paramount concern. To place a termination date on those prior rights would not only be a travesty of justice but also would contravene the very concepts of seniority and prior rights.
 
 Id. at 18. The Board continued:
 
 39
 This Board also finds the former employees should be given the seniority dates of their earliest employment date, i.e., the seniority date carried on the Rock Island. Without extensive elaboration, we feel this would not be too hard to accomplish.
 
 
 40
 Id.
 
 
 41
 c. The Arbitrator's Decision
 
 
 42
 The arbitrator issued his award in the ground service employees' dispute on May 20, 1983. Without notice of the UTU's centrally announced position in Tucumcari and without reference to the UTU Constitution, the arbitrator declared that the October 22, 1980 implementing agreement met the requirements of the March 4th Agreement. Moreover, at the arbitration, the Rock Island employees contended they were inadequately represented, under the terms of the March 4th Agreement, in the negotiation of the implementing agreements. The arbitrator simply deferred to the position of the acquiring union. In his analysis of this claim, the arbitrator characterized this very serious situation as merely "unfortunate." Specifically he stated:
 
 
 43
 Full opportunity was given to all representatives of these employees to further discuss this matter with the Carrier in order to reach an implementing agreement. Unfortunately, with respect to the crafts here involved only the C & NW--UTU representative reached an understanding with the Carrier. This does not mean, however, that the UTU representatives of former Rock Island employees were not afforded the fullest opportunity to make their case with respect to the allocation of additional manpower.
 
 
 44
 Arbitration at 4.
 
 
 45
 Thus, the arbitrator inexplicably appeared to believe, because the Rock Island employees could "talk" to the carrier, that agents of the acquiring unions could properly and adequately represent the former Rock Island employees in the seniority negotiations. In doing so, he never noted that the agents of the acquiring unions represented constituencies with absolutely adverse interests.
 
 
 46
 Finally, in contravention of the intent of the March 4th Agreement, the UTU Constitution, and Tucumcari, the arbitrator declared that any notion of prior rights or dovetailing of seniority would be improper and that employees of bankrupt railroads were only entitled to limited relief. He therefore affirmed, with a few insignificant modifications, the terms of the October 22, 1980, implementing agreement.
 
 
 47
 Having set forth the factual background of the present dispute, we turn to resolving the specific legal claims of the parties.
 
 
 48
 III. JURISDICTIONAL ARGUMENTS COMMON TO ALL APPELLANTS
 
 A. Overview
 
 49
 All appellants in this action assert violations of the March 4th Agreement and RITEA. With one exception, they sought redress for their grievances in federal court without first resorting to arbitration. Appellants outline several legal theories in support of federal court jurisdiction. Each is unavailing.
 
 
 50
 B. Section 105 of RITEA Does Not Create a Right of Action in Federal Court
 
 
 51
 First, the former Rock Island employees claim that Section 105 of RITEA, 45 U.S.C. Sec. 1004, adopted May 30, 1980, creates a right of action in federal court. Section 105 states:
 
 
 52
 (a) Each person who is an employee of the Rock Island Railroad on August 1, 1979, and who, prior to January 1, 1981, is separated or furloughed (other than for cause) from his employment with such railroad * * * as a result of a reduction of service by such railroad * * * shall, unless found to be less qualified than other applicants, have the first right of hire by any other rail carrier that is subject to regulation by the Commission for any vacancy [not covered by an affirmative action plan].
 
 
 53
 On January 13, 1983, 45 U.S.C. Sec. 797c(g) was amended to subject this right to arbitration. See Rail Safety and Service Improvement Act of 1982, Pub.L. No. 97-468, Sec. 235, 96 Stat. 2545, 2547 (1982). The amended statute provided:
 
 
 54
 Any dispute, grievance or claim arising under * * * section 1004 of this title (45 U.S.C. sec. 1004) shall be subject to resolution in accordance with the following procedures:
 
 
 55
 (1) Any employee with such a dispute, grievance, or claim may petition the [The Railroad Retirement] Board to review and investigate the dispute, grievance, or claim.
 
 
 56
 (2) The Board shall investigate the dispute, grievance, or claim, and if it concludes that the employee's rights under * * * section 1004 of this title may have been violated, the dispute, grievance, or claim shall be subject to resolution in accordance with the procedures set forth in section 153 of this title.
 
 
 57
 (3) In the case of any violation of * * * section 1004 of this title, the Adjustment Board (or any division or delegate thereof) or any other board of adjustment created under section 153 of this title shall, where appropriate, award such relief, including back pay, as may be necessary to enforce the employee's rights.
 
 
 58
 45 U.S.C. Sec. 797c(g) (emphasis added).
 
 
 59
 Based on the foregoing, the appellants claim that the language "shall be subject to" is permissive rather than mandatory. We agree fully with the district court and find that the language of 45 U.S.C. Sec. 797c(g) is clearly mandatory and that appellants' arguments in this regard are frivolous.
 
 
 60
 C. The Rock Island Employees Do Not Have a Vested Right to an Action in Federal Court
 
 
 61
 The appellants also contend that during the interim period between the date RITEA became law on May 30, 1980, and the date the right of first hire became subject to arbitration on August 13, 1983, the Rock Island employees had a vested right to bring an action in federal district court under 28 U.S.C. Sec. 1331 that could not be eliminated by a later amendment of the law. We disagree.
 
 The Supreme Court has clearly stated:
 
 62
 [W]hen the jurisdiction of a cause depends upon a statute the repeal of the statute takes away jurisdiction. And it is equally clear, that where a jurisdiction conferred by statute, is prohibited by a subsequent statute, the prohibition is, so far, a repeal of the statute conferring jurisdiction.
 
 
 63
 Merchants' Insurance Co. v. Ritchie, 72 U.S. (5 Wall.) 541, 544-45, 18 L.Ed. 540 (1867).
 
 
 64
 Moreover, a closely related issue was decided in the case of Brotherhood of Locomotive Engineers v. Burlington Northern, 580 F.Supp. 797 (D.Colo.1984). There the district court was faced with the issue of what happened to pending claims in federal district court after 45 U.S.C. Sec. 797c(g) had been amended to require arbitration for these claims. The court, after thorough review of the authorities, found that claims brought correctly in federal court before the enactment of the arbitration provision lacked jurisdiction after its effective date.
 
 
 65
 Clearly, jurisdiction was withdrawn in the present case by the amendment of 45 U.S.C. Sec. 797c(g). Appellants' case was not even properly pending in federal court at the time of the amendment. Thus, there is no conceivable basis for jurisdiction under any vested rights theory.
 
 
 66
 Clearly, jurisdiction was withdrawn in the present case by the amendment of 45 U.S.C. Sec. 797c(g). Appellants' case was not even properly pending in federal court at the time of the amendment. Thus, there is no conceivable basis for jurisdiction under any vested rights theory.
 
 
 67
 D. Section 122 of RITEA Does Not Create A Private Right of Action
 
 
 68
 The former Rock Island employees next contend that section 122 of RITEA creates a cause of action in federal court. We disagree.
 
 
 69
 Section 122 of the Act, 45 U.S.C. Sec. 1017, provides:
 
 
 70
 The Commission may authorize any rail carrier willing to do so voluntarily to use the tracks and facilities of a carrier which * * * was the subject of a proceeding pending under section 77 of the Bankruptcy Act or under subchapter IV of Chapter 11 of Title 11. The use of such tracks and facilities shall be under the terms of compensation as the carriers establish between themselves, or if the carriers are unable to agree under such terms of compensation as the Commission finds to be reasonable. * * *
 
 
 71
 In carrying out the provisions of this section, the Commission shall require, to the maximum extent practicable, the use of the employees who would normally have performed work in connection with the traffic subject to the action of the Commission.
 
 
 72
 Section 105 already creates a cause of action. See 42 U.S.C. Sec. 1004. It is unlikely that, without some additional special purpose, Congress intended to create a duplicative action. Moreover, the language of section 122 only authorizes the ICC to act and does not support an interpretation which would provide jurisdiction for individual suits.
 
 
 73
 In a related argument, appellants contend that section 122 and 28 U.S.C. Sec. 1336[10] together create federal court jurisdiction over their claims. We again disagree.
 
 
 74
 Section 1336 of 28 U.S.C. permits the federal courts jurisdiction over causes of action elsewhere enumerated. It says nothing about causes of action based on alleged violations of section 122 or of ICC orders issued pursuant thereto. Moreover, the Supreme Court has repeatedly held that jurisdictional statutes such as 28 U.S.C. Sec. 1336 do not of themselves establish a private right of action. See Touche Ross & Co. v. Redington, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 71 S.Ct. 692, 95 L.Ed. 912 (1951).
 
 
 75
 E. Plaintiff's Unfair Representation Claims are Barred by the Statute of Limitations
 
 
 76
 In terms of the unfair representation claims brought by the former Rock Island employees, we agree with the district court, both in that these claims are governed by the six-month statute of limitation set forth by the Supreme Court in Del Costello v. International Brotherhood of Teamsters, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983).
 
 
 77
 Thus, the claims of only one group of appellants have been preserved. The statute of limitations on the ground service employees suit began to run on May 20, 1983, the date the arbitration award was issued. They brought their action on November 18, 1983, two days before the expiration of the six-month limitation period. Thus, their claims are preserved. See Stafford v. Ford Motor Co., 835 F.2d 1227, 1232-33 (8th Cir.1987).IV. REMEDIES AVAILABLE TO APPELLANTS
 
 A. Overview
 
 78
 Given the fact that the appellants' substantive claims cannot properly be brought in federal court, we now turn to the task of determining what remedies, if any, remain available to them.
 
 
 79
 For purposes of resolving this question, the 158 individual claimants involved in the present action are best divided into three categories: March 4th Agreement appellants, non-hire appellants, and new-hire appellants.
 
 
 80
 1. The March 4th Agreement Appellants.
 
 
 81
 The March 4th Agreement appellants are thirty-three individuals hired by the CNW who claim they were not given adequate seniority under the March 4th Agreement. This group can be subdivided into two classes: the ground service employees and the engine service employees.
 
 
 82
 a. The Ground Service Employees
 
 
 83
 Nine of the thirty-three March 4th appellants were former ground service employees of Rock Island represented by the UTU. These employees were subject to the October 22, 1980 interim implementing agreement. They claimed that this implementing agreement was improper for several reasons and went to arbitration to protest its terms. Their claims were rejected by the arbitrator.
 
 
 84
 b. The Engine Service Employees
 
 
 85
 Twenty-four of the March 4th appellants were former engine service employees represented by both the UTU and the BLE. These employees were subject to two February 16, 1982 implementing agreements reached between the CNW and their respective unions. These employees, like the ground service employees, claim that the implementing agreements governing their seniority were improper. These appellants, however, did not take their protests to arbitration.
 
 2. The Non-Hire Appellants
 
 86
 This group comprises eighty-one employees who applied for employment with the CNW in 1980 or 1981 for available positions but were not hired. Instead, the CNW hired persons without prior service on either the Rock Island or the CNW. This group claims they had a right to be hired both under the March 4th Agreement and section 105 of RITEA, 45 U.S.C. Sec. 1004.
 
 3. The New-Hire Appellants
 
 87
 This group is made up of forty-four former Rock Island employees taken on by the CNW as "new hires" for work the CNW claims did not arise out of the acquisition of the Rock Island. These appellants claim a deprivation of seniority rights under the terms of the March 4th Agreement.
 
 
 88
 B. The Arbitration of the Ground Service Appellants
 
 
 89
 The March 4th ground service employees contend that the arbitration proceeding of May 20, 1983, was improper and must be vacated. We agree.
 
 1. The Duty of Fair Representation
 
 90
 In order to establish unfair representation by a union, the claimants must show that the union's representation was "perfunctory, arbitrary, discriminatory, or in bad faith." International Brotherhood of Electrical Workers v. Foust, 442 U.S. 42, 47, 99 S.Ct. 2121, 2125, 60 L.Ed.2d 698 (1979). A union representing a majority bargaining coalition owes a strict supplementary duty of fair representation to the position of a minority group within the coalition with interests adverse to the majority. In Steele v. Louisville & Nashville R.R., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944), the Supreme Court held "that the organization chosen to represent a craft is to represent all of its members, the majority as well as the minority and is to act for and not against those whom it represents." Id. at 202, 65 S.Ct. at 232. Further, in Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967), the Court declared:[T]he exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.
 
 
 91
 This duty to the interests of an adverse minority is perhaps most thoroughly delineated in the case of Jones v. Trans World Airlines, 495 F.2d 790 (2d Cir.1974). In Jones, the Second Circuit found a breach of the duty of fair representation by a union representing an adverse minority group sufficient cause to set aside the seniority provisions of a collective bargaining agreement.
 
 
 92
 In Jones, Trans World Airlines (TWA) entered into a collective bargaining agreement with the International Association of Machinists and Aerospace Workers International Union (IAM) in January of 1970. Prior to this time, certain employees titled "passenger relations agents" had not been asked to join a union and were not required to join a union under the union security clause in effect at that time. Moreover, prior to that time, the collective bargaining agreement provided that all employees would hold job seniority status as of the date of their job assignment.
 
 
 93
 Under the terms of the new agreement, the work of passenger relations agents was included within the jurisdiction of the IAM in the "guards" bargaining unit. TWA and IAM further agreed that the passenger relations employees would be treated as new hires for the purpose of seniority. The effect of this was to make any IAM members who wished to transfer to the job of passenger relations agent senior to all non-IAM employees who had previously held these positions, despite the fact that the old contract fixed seniority by the date of assignment to a given job classification.
 
 
 94
 In June of 1970, TWA announced that the passenger relations jobs were guard vacancies. Twelve members of the IAM guard unit bid for the jobs and were given seniority as of the date they assumed the duties of passenger relations agents, i.e. June 22, 1970. The rest of the jobs were filled by non-IAM workers who were then holding these positions. These workers were given seniority as of the dates they joined the union, generally sometime in July or August of 1970. When the new union members found out they had less seniority than the twelve newcomers to their department, they brought an action in district court claiming that the unions had unfairly represented them. The district court denied relief.
 
 
 95
 The Second Circuit reversed. The court found characteristic that distinguished the new union members from the employees afforded greater seniority was the fact of union membership prior to the January 1970 collective bargaining agreement. The court termed this sort of discrimination in the negotiation of seniority "arbitrary and invidious" and found that such conduct "violate[d] the unions' duty to represent fairly all members of the bargaining unit." Id. at 797.
 
 
 96
 The court declared that, while the standard for unfair representation generally involves arbitrary, perfunctory, or discriminatory conduct, the union must meet a higher standard when the interests of an adverse minority are affected. Specifically, the court said the union representative must provide "substantive and procedural safeguards" for the minority group.
 
 
 97
 [I]t is evident that a union may breach its duty of fair representation by actions other than those motivated by anti-minority animus. While it is true that situations in which a union violates its duty have been indentified by such phrases as "hostile discrimination," * * * and "arbitrary, discriminatory," or "bad faith" conduct, * * * these phrases do not delimit the specific categories of violations of the duty of fair representation. They only serve to emphasize that the union has broad discretion to adjust the demands of competing groups within its constituency as long as it does not act arbitrarily. * * *
 
 
 98
 In the instant case, the IAM's duty to the appellants was broader than a mere duty not to negotiate the 1970 contract seniority provisions out of hostility toward them. The objective of the duty of fair representation is to provide substantive and procedural safeguards for minority members of the collective bargaining unit.
 
 
 99
 Id. at 798 (citations omitted and emphasis added).
 
 
 100
 The court then declared that the seniority of the former passenger relations employees should be determined as of the date of original job assignment.
 
 
 101
 2. Impropriety of the October 22, 1980 Interim Implementing Agreement
 
 
 102
 The October 22, 1980 implementing agreement was negotiated by representatives of CNW employees in contravention of the terms and the purpose of the March 4th Agreement and it was thus hopelessly flawed.
 
 
 103
 The March 4th Agreement was designed to fill a practical necessity by easing the potentially troubled transition period during which the CNW acquired the Rock Island Railroad. The purpose of the March 4th Agreement was to provide the CNW labor peace in exchange for accommodation in terms of jobs and seniority for the former employees of the Rock Island Railroad. Thus, the terms of the March 4th Agreement were not a gratuitous gesture by the CNW to the former Rock Island employees, but represented "bargained-for" consideration in the truest sense of the term.
 
 
 104
 When a highly unionized rail carrier takes over the trackage of another highly unionized carrier, whether by merger or acquisition, unless assurances are made to the employees of both acquiring and acquired railroads, labor dislocation and strife is likely to be bitter and endemic. First, the employees of the acquired company face the personally devastating prospect of losing long-standing valued seniority rights and, more importantly, of losing jobs. In such a period, displaced employees are likely to force the representatives of their local and international unions into using pressure tactics to force the acquiring company into some sort of an accommodation, both in terms of rights to hire and job seniority. The acquiring companies are very susceptible to this sort of pressure, because they themselves are highly unionized--generally with the same unions as the acquired company. In addition, they are dependent on the skilled labor force which the union dominates.
 
 
 105
 The complication, however, does not end here. On the other side of the coin, the incumbent employees of the acquiring companies are likely to feel threatened by the hiring of new employees with advanced seniority rights and are likely to demand some sort of firm assurance, both in terms of their job status and vested seniority rights.
 
 
 106
 To settle these conflicts, a common and well-established practice in acquisitions or mergers is to engage in some sort of dovetailing of seniority. See Humphrey v. Moore, 375 U.S. 335, 347, 84 S.Ct. 363, 371, 11 L.Ed.2d 370 (1964) (The integration or dovetailing of seniority is "a familiar and frequently equitable solution to the inevitably conflicting interests which arise in the wake of a merger or an absorption.").
 
 
 107
 In terms of seniority allocation for former Rock Island employees hired by acquiring railroads, section 9 of the March 4th Agreement sets forth procedures to determine job status. Specifically, it states:
 
 
 108
 [A]greements will be reached on each purchasing carrier concerning the manner in which seniority will be allocated in filling additional job assignments, between the purchasing carrier's employees and the bankrupt carrier employees hired by the purchasing carrier.
 
 
 109
 March 4th Agreement at 7.
 
 
 110
 Carefully parsing the words of this difficult phrase and reviewing alternative interpretations of it, it is clear that any correct construction must include the representatives of the former Rock Island employees in these negotiations.
 
 
 111
 One construction would have this phrase mean that an "agreement" would be reached at a future time with regard to seniority allocation as amongst the combined groups of preacquisition CNW employees and former employees of the Rock Island recently employed by the CNW. This construction would not in any way specify the parties to the potential agreement and would thus leave the selection of these parties completely within the control of the CNW. Such an utter abdication of power over selecting the parties to determine seniority, however, would result in the complete loss of control over seniority allocation and thus runs contrary to the purposes of the Agreement, i.e., to protect the interests of the former Rock Island employees and to avoid labor strife in the critical transition period. Moreover, if the purpose of the agreement was to give the company the power to determine seniority, it is likely that the agreement would simply have said this.
 
 
 112
 A second construction, implicitly urged by appellees, would have this clause create a procedure whereby seniority agreements would be reached between the CNW and representatives of the CNW's unions. The text, however, does not support such a construction. Further, the March 4th Agreement was designed to protect the seniority rights of former Rock Island employees. Yet, it is vital to realize that there is no group that would be less inclined to protect the seniority rights of the Rock Island employees than the representatives of the CNW employees. The reason is simple. Any seniority credit given Rock Island employees for work performed while with the Rock Island would adversely affect the seniority rights of the employees of the CNW. Given this, the representatives of the CNW unions could be expected to favor the interests of the pre-acquisition employees, utterly frustrating the purposes of the agreement. Thus, this second construction could not possibly be correct.
 
 
 113
 The third and correct construction would require the implementing agreements be reached with the active and significant participation of the representatives of the former Rock Island employees. Strong support for this construction is found in the March 4th Agreement's purpose, to protect the interests of former Rock Island employees, in the union's constitution, and in Tucumcari, which, in delineating internal UTU policy, declared that all employee representatives should participate in the negotiation of implementing agreements.[11]
 
 3. The Arbitration Proceeding Was Improper
 
 114
 The ground service employee arbitration was fundamentally improper because the arbitrator deferred to an invalid and fundamentally unfair implementing agreement.
 
 
 115
 The arbitrator clearly based his decision on the October 22, 1980 interim agreement. He declared, deferring to the implementing agreement and the position of the acquiring company's union representatives, without support from the record or any coherent reason, that the Rock Island employees had sufficient participatory rights to ensure the implementing agreement was consistent with the March 4th Agreement. Further, he specifically deferred to the terms of the October 22, 1980 agreement, declaring both that it would be inappropriate to make a redetermination of seniority and that prior rights and dovetailing were not contemplated by the March 4th Agreement.
 
 
 116
 Next, although not necessary to our holding, we note the arbitrator made his determination without an understanding of the requirements of the union's constitution. To conform with the UTU constitution, the union should have entered the arbitration with a unified position and actively sought seniority for Rock Island employees. What happened in the ground service employees' arbitration, however, could not have been more different. The union allowed the claims of the CNW employees with regard to the allocation of seniority--a position contrary to its centrally determined seniority policy--to go unchallenged to the arbitrator. This impropriety strongly contributed to providing a legitimate forum to a position which it had previously determined illegitimate and which otherwise would probably not have prevailed.[12]
 
 4. Conclusion
 
 117
 In Jones, the Second Circuit found that the duty of fair representation had been violated when a union preferred long-term members' interests to those of new members. In some intuitive ways this line of conduct by the union might seem justifiable. It might be argued the union owed more loyalty to those long term members than to those employees not yet members of the union. Nevertheless, the court found this conduct to be "arbitrary" and "invidious." Further, the court delineated a clear obligation to represent these future members and to assure them substantive and procedural safeguards in the contract talks.
 
 
 118
 In terms of the negotiations of the October 22, 1980 implementing agreement, the inherent force of Jones cuts powerfully in favor of the Rock Island appellants. First, the former Rock Island employees are in a stronger position to assert unfair representation than the non-union passenger relations agents in Jones. While, in a sense, both groups stood poised to become members of the group represented by their bargaining agent, the Rock Island employees were already members of an international charged with representing their interests. Thus, not only are the Rock Island employees owed the substantive and procedural guarantees mandated by Jones--protections which were clearly not provided--but additional protection arising from their membership in the international union.
 
 
 119
 In addition, the UTU in the present case offended in more grievous ways affirmative duties of fair representation clearly imposed upon them. The March 4th Agreement and Tucumcari required the participation of the former Rock Island employees in the negotiation of the implementing agreements. Moreover, the appellants repeatedly requested participation. Finally, during the critical period of the transition, the UTU was actively closing down and consolidating its Rock Island union locals. This likely made it more difficult for the former Rock Island employees to understand and guard their rights and to determine whether their interests were being adequately protected by the CNW employees' representatives.
 
 
 120
 Essentially, however, we find that the October 22, 1980 implementing agreement was negotiated by representatives of a group with interests utterly hostile and adverse to those of the ground service employees, and was thus irrevocably flawed by unfair representation. The arbitrator then rendered a decision in which, without coherent or logical reasons, he deferred to the improperly negotiated agreement.
 
 
 121
 Under the Railway Labor Act, an arbitration can be vacated when the award exceeds the jurisdiction of the arbitrator. See 45 U.S.C. Sec. 153(p). In the arbitration context, an award "without foundation in reason or fact" is equated with an award that exceeds the authority or jurisdiction of the arbitrating body." Brotherhood of Railroad Trainmen v. Central of Georgia Ry., 415 F.2d 403, 411-12 (5th Cir.1969). The Trainmen court went on:
 
 
 122
 To merit judicial enforcement, an award must have a basis that is at least rationally inferable, if not obviously drawn, from the letter or purpose of the collective bargaining agreement. The arbitrator's role is to carry out the aims of the agreement, and his role defines the scope of his authority. When he is no longer carrying out the agreement or when his position cannot be considered in any way rational, he has exceeded his jurisdiction. The requirement that the result of arbitration have "foundation in reason or fact" means that the award must, in some logical way, be derived from the wording or purpose of the contract. This Court in Safeway Stores v. American Bakery Workers Local 111, 5th Cir.1968, 390 F.2d 79, 81, 82, has recently announced the standard for review of an arbitrator's reward: " '[I]f the award is arbitrary, capricious or not adequately grounded in the basic collective bargaining contract, it will not be enforced by the courts.' * * * On its face the award should ordinarily reveal that it finds its source in the contract and those circumstances out of which there comes the 'common law of the shop' ".
 
 
 123
 Id. at 412.
 
 
 124
 In deferring to the fundamentally flawed agreement, the arbitrator's decision was not in any way derived from the "wording or purpose of the collective bargaining agreement." Indeed, the purpose of the March 4th Agreement was to provide "a fair, equitable and complete arrangement for the protection of the Rock Island Employees." We hold this carefully delineated purpose could not be satisfied when the party negotiating for the ground service employees is the party with the single most adverse set of interests to appellants in the matter of seniority. We thus find the arbitrator exceeded his jurisdiction under the Railway Labor Act.
 
 
 125
 We, therefore, remand these cases to the district court with directions to enter an order vacating the ground service employees' arbitration. We further direct the district court to order the parties to renegotiate an implementing agreement in line with the requirements set forth in the March 4th Agreement. In these negotiations, the representatives of the Rock Island employees will participate in an active and significant manner. We leave it to the International to determine whether representatives of the former Rock Island employees will be necessary parties to the agreement, as its internal decision in Tucumcari strongly suggests, or whether they will be carefully consulted by the International prior to its negotiating the agreement.
 
 
 126
 Should the first course be chosen and the parties fail to reach a satisfactory agreement, the International shall represent both the CNW and former Rock Island employees in the arbitration that is to follow under the terms of the March 4th Agreement. Before the matter goes to arbitration, the International shall develop a unified position consistent with its constitution and internal decisions to assure adequate protection of the seniority interests of the former Rock Island employees. If the second course is chosen, the International shall similarly be directed by the district court to present a unified position consistent with its constitution and internal decisions. Again, should the parties fail to reach agreement, the International shall represent both the CNW and former Rock Island employees in line with a predetermined unified position.
 
 C. The Non-Hire Appellants
 1. Overview
 
 127
 The appellants in this category are former Rock Island employees who claim a right to be hired under the March 4th Agreement and Section 105 of RITEA, 45 U.S.C. Sec. 1004. As discussed above, the March 4th Agreement provides a right of first hire in terms of work arising out of the acquisition of former Rock Island trackage. RITEA provides a sweeping right of first hire to any former Rock Island employee who is not less qualified than other applicants for any position not covered by an affirmative action plan. These appellants allege that the CNW hired a great number of new workers who were not former Rock Island employees in violation of RITEA. Further, they allege that many of these new workers were hired to work on the former trackage of the Rock Island, thus violating the March 4th Agreement.
 
 
 128
 2. The Sunsetting Provision of 45 U.S.C. Sec. 797c(f).
 
 
 129
 The arbitration provision which governs the appellants' claim is 45 U.S.C. Sec. 797c(g). Subsection (f) of 45 U.S.C. Sec. 797c states: "The provisions of this section shall cease to be effective on the expiration of the 6-year period beginning on August 13, 1981." Based upon this sunsetting provision, appellees argue that appellants have lost their right to arbitration. Appellants, on the other hand, contend that because the statutory subdivision containing the arbitration provision has lapsed, they now have a clear and unimpeded right to an action in federal court. The theories of both parties are incorrect.
 
 
 130
 3. Arbitration is Still Available to Appellants
 
 
 131
 Upon careful examination, it is clear that Congress did not intend to phase out arbitral redress for disputes involving preferential hiring under RITEA. When the evolving structure and purpose of 45 U.S.C. Sec. 797c is carefully examined, it is apparent that the sunsetting provision of that section was intended to eliminate the Central Register of Railroad Employment administered by the Railroad Retirement Board (RRB) and not to cut off the right to arbitration for disputes concerning preferential hiring.[13]
 
 
 132
 45 U.S.C. Sec. 797, which corresponds to Title VII of the Northeast Rail Service Act of 1981, Pub.L. No. 97-35, 95 Stat. 643 (1981) (NRSA), was a part of the massive Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97-35, 95 Stat. 357 (1981) (OBRA) designed, at least at the outset, to drastically reduce the size and commitments of the federal government.
 
 
 133
 Title VII, part of the effort to privatize the failing Conrail, allowed the railroad to end onerous protective obligations that had been established by Title V of the Rail Reorganization Act of 1973, Pub.L. No. 93-236, 87 Stat. 985 (1973). Specifically, Title VII allowed the railroad to terminate some employees or employee benefits in exchange for specified cash payments.
 
 
 134
 Part of the transition that was accomplished by Title VII involved the creation of a central register of displaced railroad employees. The register was to be of limited duration and was designed to assist employees in securing their preferential hiring rights. See NRSA Sec. 704, 45 U.S.C. Sec. 797c. As originally introduced in Congress, Sec. 797c contained only the provisions found in subsections now codified (a) through (f). See H.R. 3488, 97th Cong., 1st Sess. Sec. 303 (introduced May 5, 1981); S. 1377, 97th Cong., 1st Sess. Secs. 413-4 (introduced June 7, 1981). Subsections (a) through (e) required the RRB to maintain a central register of displaced railroad employees to facilitate their reemployment and to assist in the implementation of preferential hiring rights. Subsection (f) was the sunset provision which allowed the RRB to end the registration apparatus within a reasonable time after the employee terminations allowed by NRSA.
 
 
 135
 It is important to note that subsection (g) of Sec. 797c, the arbitration provision at the heart of the present controversy, was not a coherent part of the legislative scheme of the original Sec. 797c, but only a last minute afterthought added later in conference. See H.R.Conf.Rep. No. 97-208, Book 1, 1st. Sess., 329-30 (1981). It must be remembered that OBRA itself has long been noted for the vast legislative confusion engendered and the significant number of drafting oversights and errors that occurred as it wended its way through the Congress. Given this background, it is likely that any implication that Congress intended the right to arbitration for preferential hiring to end with this sunsetting provision was inadvertent.
 
 
 136
 This likelihood of inadvertency becomes a certainty when one examines the internal structure of Title VII. Title VII addresses a broad range of issues affected by the NRSA.[14] With only a few exceptions, it subjects disputes concerning these various topics to resolution under section 714, 45 U.S.C. Sec. 797m, which provides for arbitration by an adjustment board under section 3 of the Railway Labor Act, 45 U.S.C. Sec. 153. Section 714 has no sunset provision.
 
 
 137
 The right to preferential hire was one of the few exceptions to arbitration under section 797m, largely because the right to preferential hire was initially related to the central register maintained by the RRB. The only substantive difference between sections 797c(g), the arbitration provision at issue here, and section 797m is that the former subjects the right to arbitration to a preliminary screening by the RRB, the board charged with maintaining the central register. The substantive arbitration of both types of disputes is eventually accomplished by an adjustment board under 45 U.S.C. Sec. 153. While the central register was in existence, it certainly made sense to subject preferential hiring claims to a preliminary screening by the RRB, which would be likely to have all the relevant information concerning these claims close at hand. Yet, the Congress could not have intended to cut off the right to arbitration completely to employees who had preferential hiring claims when the central register ceased to exist, particularly when arbitration was still available to those asserting grievances under almost all the other topic areas covered by Title VII.
 
 
 138
 We, therefore, find, as a matter of statutory interpretation, that the sunsetting provision of 45 U.S.C. Sec. 797c only applies to the maintenance of the Central Register of Employees required under Title VII and that claims involving preferential hiring of former Rock Island employees with the CNW remain subject to arbitration by an adjustment board under section 3 of the Railway Labor Act, 45 U.S.C. Sec. 153.
 
 4. Conclusion
 
 139
 a. Specific Remedy to Non-Hire Appellants
 
 
 140
 Given the fact that the right to arbitration under 45 U.S.C. Sec. 797c(g) still is open to appellants, we remand to the district court with directions to send the disputes under RITEA to be resolved by an adjustment board under section 3 of the Railway Labor Act. Moreover, the adjustment board should, at the same time, consider appellants' claims arising under the March 4th Agreement.
 
 
 141
 b. Laches
 
 
 142
 Because neither RITEA nor the March 4th Agreement has any specific period of limitations, we leave to the arbitrator the question of whether the claims of the non-hire appellants are barred by laches.
 
 
 143
 In deciding this issue, the arbitrator is directed to take into account the following factors. First, the arbitrator should consider the delay in seeking redress caused by the closing of the Rock Island locals by various internationals. In this regard, the arbitrator should determine whether the former Rock Island employees were adequately informed of their rights under RITEA and the March 4th Agreement. Specifically, he should determine whether there were false assurances made by union representatives to the effect that Rock Island grievances would be redressed and the effect such assurances might have had in delaying action by the Rock Island employees.
 
 
 144
 Second, the arbitrator should take into account the cumulative effect of the serious unfair representation by the internationals in terms of the March 4th appellants. Not only did the unions act unfairly in the negotiation of the implementation agreement of the ground service employees, but they also did not properly represent the former Rock Island employees in the arbitration. This unfairness by the internationals to the March 4th appellants may have convinced the non-hire appellants that it would be futile to process their claims through conventional channels because they believed they could not rely on their union representatives to adequately represent their interests.
 
 D. March 4th Engine Services Employees
 
 145
 The Newton engine service employees claim that the seniority they received under the implementing agreements of February 22, 1982, was inadequate under the terms of the March 4th Agreement. The CNW answers that these employees were treated fairly.
 
 
 146
 We hold that the March 4th Engine Service plaintiffs have the right to have their claims submitted to a neutral arbitrator to determine whether their seniority rights were adequately protected under the terms of the February 16, 1982 implementing agreement. Appellants' claims are, however, subject to the defense of laches. In determining whether appellants' claims are barred by laches, the arbitrator should take into account all those factors listed in section IV(C)(4)(b) of this opinion.
 
 E. The New-Hire Appellants
 
 147
 A fourth group of claimants are the new-hire appellants. These appellants were hired by the Rock Island after its acquisition by the CNW. They received no seniority and contend that their rights were violated under the March 4th Agreement. The CNW contends that the jobs the new hire appellants received did not arise out of the work related to the Rock Island acquisition, and thus they were not deserving of any seniority under the March 4th Agreement. Clearly, if the work did not arise directly from the Rock Island acquisition, the CNW is correct.
 
 
 148
 These new-hire appellants have the right to have their claims submitted to a neutral arbitrator to determine whether the jobs they received arose from the acquisition and, if they did, what seniority rights are due these appellants. Appellants' claims are, of course, subject to the defense of laches. In determining whether appellants' claims are barred by laches, the arbitrator should take into account all those factors listed in section IV(C)(4)(b) of this opinion.
 
 V. CONCLUSION
 
 149
 This matter is remanded to the district court for action consistent with this opinion. Each party will bear its own costs on appeal. The mandate of this Court shall issue forthwith.
 
 ORDER
 
 150
 This matter comes before us on petition for rehearing and suggestion for rehearing en banc. After consideration of the various petitions, we vacate our opinion dated January 8, 1988, and substitute this revised opinion in its stead.
 
 
 
 [1]
 The United Transportation Union, the Brotherhood of Locomotive Engineers, Railroad Yardmasters of America, and the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employes
 
 
 [2]
 During this period, several other railroads were also given authority to conduct operations over other parts of the former Rock Island lines. See Kansas City Terminal Ry. Co.--Directed to Operate Over--Chicago, R.I. & P.R.R. Co., Debtor, 360 I.C.C. 289, 290 (1979)
 
 
 [3]
 This agreement, entitled Labor Protective Agreement between Railroad Parties Hereto Involved in Midwest Rail Restructuring and Employees of Such Railroads Represented by the Rail Labor Organizations Operating through the Railway Labor Executives' Association, is reproduced in 1 Joint Appendix 131
 
 
 [4]
 Specifically, Article II of the March 4th Agreement provides:
 A purchasing carrier shall determine its necessary additional manpower requirements by craft due to its taking over [the] Rock Island [line]. * * * Each of the determinations shall be discussed with representatives of the crafts on purchasing carrier and on the Rock Island * * * with detailed explanations to them of the basis for each determination prior to serving notice under paragraph 4 hereof.
 As a carrier determines its need for additional employees under this Article, it shall allow eligible employees in seniority order on the Rock Island * * * the first right of hire * * * dependent on whose trackage is involved and consistent with the purpose of Section 8 of the Milwaukee Railroad Restructuring Act. * * * In carrying out the purposes of this section, the purchasing carriers shall first utilize existing seniority rosters applicable to the appropriate craft and seniority district of the lines and territories involved in fulfilling employment needs in connection therewith.
 
 
 [5]
 Under the "Congressional Findings" section, the Act states:
 (1) uninterrupted continuation of service over Rock Island lines is dependent on adequate employee protection provisions covering Rock Island Railroad employees who are not hired by other railroads;
 (2) for those Rock Island Employees not hired by other rail carriers, there is no other practicable means of obtaining funds to meet the necessary costs of such employee protection that are assumed by the Rock Island Railroad;
 (3) a cessation of necessary operations of the Rock Island would have serious repercussions on the economies of the States in which such railroad principally operates; and
 (4) premature cessation of services over lines which are the subject of pending purchase application would result in harm to the shipping public and could imperil continuation of vital commuter service.
 RITEA Sec. 102, 45 U.S.C. Sec. 1001.
 
 
 [6]
 The House conference report accompanying RITEA describes the purpose of Section 105 in the following terms:
 SECTION 105--RAILROAD HIRING
 Senate Bill.--Section 105 of the Senate bill is based on a similar provision in the Milwaukee Railroad Restructuring Act. It provides for priority hiring of Rock Island employees unless they are found less qualified than other applicants or unless such priority hiring would interfere with a carrier's equal opportunity employment obligations.
 House Amendment.--The House amendment ... is also patterned after the Milwaukee Railroad Restructuring Act. It specifically states that rights afforded to Rock Island employees under this section shall be coequal to rights afforded Milwaukee employees.
 Conference Substitute.--* * * In general, this section is intended to insure that eligible Rock Island employees will be hired without delay or discrimination. The successful implementation of this provision depends upon the full cooperation of other carriers.
 H.R.Conf.Rep. No. 96-1041, 96th Cong., 2d Sess. 25 (1980) (emphasis added), U.S.Code Cong. & Admin.News 1980, 1156, 1186.
 
 
 [7]
 Article 85 of the UTU Constitution provides in relevant part:
 The General Chairman must poll the entire General Committee prior to signing any system agreements and be governed by the majority of the votes cast. The General Chairman must poll the affected Local Chairmen prior to signing any local agreements and be governed by the majority of the votes cast.
 See Joint Appendix 315, 347 (emphasis omitted).
 
 
 [8]
 Article 90 of the UTU Constitution provides in relevant part:
 When, through lease, purchase, merger, consolidation or other cause, a line or lines of a carrier or a portion thereof is taken over by another carrier or where, because of establishment of a new line by an existing carrier or for other reasons traffic is permanently diverted from one carrier to another or from one road and/or yard seniority district to another on the same carrier and such affects the seniority rights of employees on such carriers, General Committees of Adjustment shall arrange for a fair and equitable division of the work. Prior seniority rights of employees to service on their former seniority district or territory shall be preserved to the extent possible.
 See Joint Appendix 315, 348-49 (emphasis added).
 
 
 [9]
 Article 90 continues:
 Disputes arising under this Article which cannot be resolved by the General Committee or General Committees shall be referred to the International President. The International President shall promptly assign an officer to assist the General Committees involved in resolving the dispute. Failing to resolve the dispute the officer shall make a complete report and recommendation to the International President who, in turn, shall decide the dispute.
 Any local or member of a local affected by an action or decision of a Chairman, Sub General Committee or General Committee, or by the decision of the International President with respect to the Article may appeal such action or decision to the Board of Appeals, provided such appeal is filed with the General Secretary and Treasurer within ninety (90) days from the date of the action or decision. The Chairman, Sub General Committee, General Committee, or International President, as the case may be, shall be allowed thirty (30) days from the date the appeal is filed in which to reply to the appeal. The parties involved in an appeal shall exchange copies of the appeal and reply to the appeal.
 
 
 [10]
 28 U.S.C. Sec. 1336 provides in relevant part:
 (a) Except as otherwise provided by Act of Congress, the district courts shall have jurisdiction of any civil action to enforce, in whole or in part, any order of the Interstate Commerce Commission, and to enjoin or suspend, in whole or in part, any order of the Interstate Commerce Commission for the payment of money or the collection of fines, penalties, and forfeitures.
 
 
 [11]
 We recognize that Tucumcari did not involve commingled work and realize this fact could possibly have some bearing on its applicability in terms of the specific seniority allocation in this case. However, we believe that Tucumcari's central holding--that all employee representatives should participate in the formulation of implementing agreements--is unaffected by this distinction
 
 
 [12]
 The UTU and CNW contend that the UTU had internally determined Article 90 was not applicable "in cases of partial or total abandonment or liquidation where other carriers purchase or lease the trackage abandoned or liquidated." See Supplemental Affidavit of Robert Schmiege, Exhibit 5 at 22. The UTU further contends that the matter was to be "handled in accordance with the arbitration procedures of the March 4 agreement." Searching the record, however, we find no persuasive evidence that this exemption was anything more than an ad hoc decision made to avoid the union's responsibilities in this particular dispute. Moreover, we find nothing in the March 4th Agreement which would conflict with the unified procedure outlined in the UTU constitution
 
 
 [13]
 Moreover, even had Congress intended to eliminate arbitration for disputes concerning preferential hiring, it might well be considered fundamentally unfair to withdraw the arbitral remedy from those claims already pending in federal court on August 13, 1987. Cf. Ralpho v. Bell, 569 F.2d 607 (D.C.Cir.1977)
 
 
 [14]
 E.g., negotiation of protection agreements (Sec. 797); termination allowances (Sec. 797a); preferential hiring (Sec. 797b); maintenance of a central register of railroad employment (Sec. 797c); election and treatment of benefits (Sec. 797d); arrangement of work (Sec. 797e); contracting out (Sec. 797f); new collective bargaining agreements (Sec. 797g); employee and personal injury claims (Sec. 797h); limitation on liability (Sec. 797i); preemption (Sec. 797j); factfinding panels regarding certain collective bargaining issues (Sec. 797k); and arbitration of disputes (Sec. 797m)